# QUOCK TING *v.* UNITED STATES

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 638. Submitted April 10, 1891. — Decided May 11, 1891.

Uncontradicted evidence of interested witnesses to an improbable fact does not require judgment to be rendered accordingly.

THE petitioner, who is also the appellant, is a member of the Chinese race, but claims to have been born within the United States, and consequently to be a citizen thereof. He is sixteen years of age, and arrived at the port of San Francisco in the steamship City of New York, in February, 1888. The officers of customs refused to allow him to land, holding that he was a subject of the emperor of China, and within the restrictions of the act of May 6, 1882, and the supplemen-

tary act of 1884. He was accordingly detained by the captain of the steamship on board ; and he applied, through a friend, to the Circuit Court of the United States for the Northern District of California for a writ of *habeas corpus* to obtain his discharge from such detention, alleging that he was not within the restrictions of the acts of Congress, but was a citizen of the United States, having been born therein. The writ was issued and the petitioner brought before the court, when his testimony and that of his father was taken in support of his pretension. He testified as to his birth, as counsel observe, with surprising particularity. His story was that he was sixteen years old; that he was born in San Francisco, "on Dupont Street, upstairs," and remained in that city until he was ten years of age, when he went to China with his mother. He also mentioned the names of three persons on the ship whom he knew. When asked how he remembered their names, he answered, "When I got to China, my mother told me very often of those people and their names; she repeated them to me, and I remember them." When reminded that that was six years before, he responded: "My mother sometimes speaks those names to me very frequently." His mother was in China, and he knew nothing of the three men named. Although in the city, according to his statement, for ten years, he did not, upon his examination, show any knowledge of any places or streets therein, or of the English language. The following is a specimen of his testimony:

"Q. Can you count in English? A. I do not understand English.

"Q. Can you count in English? A. I can count in Chinese, but not in English.

"Q. Do you know the names of the days of the week in English? A. I am too small; I did not learn it.

"Q. You do not know anything at all in English? A. No, sir; not a word."

Nor did he mention any circumstance, incident or occurrence, except being born in Dupont Street, upstairs, which would lead one to suppose that he had ever been in the city. His only memory seemed to be of the names of the three men

who accompanied him back to China, whom he had not seen since, and whose names he only knew from having heard his mother repeat them. The father, who was examined, stated that he worked on a sewing machine; that the petitioner was his boy, and that he was born "at 1030 Dupont Street, upstairs," and went to China with his mother, and one of the witness's friends; and that he wanted his boy to come back to learn English. He also produced what he called his "storebook," in which he had entered the purchase of a ticket for the boy and his mother. He gave no particulars of his residence in San Francisco, of his having a family there, or of his being known among his neighbors or others as having any children.

The court, after hearing these witnesses, held that the petitioner was not illegally restrained of his liberty, but was a Chinese person forbidden by law to land within the United States, and had no right to be or remain therein. It accordingly discharged the writ, and ordered that the petitioner be remanded to the marshal to be returned to the captain of the steamship. From this judgment an appeal is taken to this court.

*Mr. J. J. Scrivener* for appellant.

*Mr. Assistant Attorney General Parker* for appellee.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

The question presented is whether the evidence before the court below was sufficient to show that the petitioner was a citizen of the United States.

The testimony given by himself amounted to very little; indeed, it was of no force or weight whatever. The particularity and positiveness with which he stated the place of his birth in San Francisco was evidently the result of instruction for his examination on this proceeding, and not a statement of what he had learned from his parents in years past. And his failure to mention any particulars as to the city of San

Francisco, which he certainly ought to have been able to do if he resided there during the first ten years of his life, was surprising. A boy of any intelligence, arriving at that age, would remember, even after the lapse of six years, some words of the language of the country, some names of streets or places or some circumstances that would satisfy one that he had been in the city before. But there was nothing whatever of this kind shown. He gave the name of no person he had seen; he described no locality or incident relating to his life in the city, nor did he repeat a single word of the language, which he must have heard during the greater part of several years, if he was there.

The testimony of the father was also devoid of any incident or circumstance corroborative of his statement. The production of the so-called store-book, in which there was an entry of passage-money paid for the boy and his mother, does not strike us as at all conclusive. The accounts of a mere worker on a sewing machine would not be likely to occupy much space; and the alleged entry could as easily have been made as the manufacture of the story repeated. If we could not believe the story in the absence of the book we should hesitate to yield credence to it upon the exhibition of the entry. If the petitioner was really born in the United States, and had lived there during the first ten years of his life, the fact must have been known to some of the father's neighbors, and incidents could readily have been given which would have placed the statement of it beyond all question. It is incredible that a father would allow the exclusion of his son from the country where he lived, when proof of his son's birth and residence there for years could have been easily shown, if such in truth had been the fact.

Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as com-

pletely as by direct adverse testimony; and there may be so many omissions in his account of particular transactions; or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced.

In *Kavanagh* v. *Wilson*, 70 N. Y. 177, 179, where the action was by a real estate broker against the personal representatives of a deceased customer to recover an alleged agreed compensation for effecting a sale, and the only witness as to the contract was the son of the plaintiff, whose own compensation depended upon the plaintiff's success, and the compensation alleged to have been agreed upon was more than double the usual compensation, it was held that the statement of the witness, under those circumstances, was not so entirely free from improbability as to justify a direction of the court to the jury to find a verdict for the plaintiff, although there was no direct contradictory testimony presented. The court said: "It is undoubtedly a general rule that when a disinterested witness, who is in no way discredited, testifies to a fact within his own knowledge, which is not of itself improbable, or in conflict with other evidence, the witness is to be believed, and the fact is to be taken as legally established, so that it cannot be disregarded by court or jury. . . . But this case is not fairly brought within this rule. Here the witness was not wholly disinterested. He was a son of the plaintiff, engaged in his business, and thus biassed and interested in feeling. His compensation for drawing the contracts (and how large that was to be does not appear) depended, I infer from the evidence, upon his father's success in getting his compensation as the broker." The court then went on to observe that the story told by the witness was not entirely free from some improbability, and that it did not appear why the broker was promised more than double the usual price for the sale of country property, nor why the compensation was never spoken of before or after, in the numerous conversations heard by witness,

nor what could have induced the promise of the large sum, when the usual commission would seem to have been ample compensation for any service to be rendered, nor why the party made the unusual promise to pay the absolute sum in no way dependent upon the amount for which the property might be negotiated. These circumstances, the court thought, presented a sufficient case for the consideration of the jury, and it held that the court below erred in refusing to submit it to them.

In *Koehler* v. *Adler*, 78 N. Y. 287, it was held that a court or jury was not bound to adopt the statements of a witness simply for the reason that no other witness had denied them, and that the character of the witness was not impeached; and that the witness might be contradicted by circumstances as well as by statements of others contrary to his own, or there might be such a degree of improbability in his statements as to deprive them of credit, however positively made. The case of *Elwood* v. *Western Union Telegraph Co.*, 45 N. Y. 549, was cited in support of this position, where, in delivering the opinion of the court, the rule and its exceptions are stated by Judge Rapallo with great clearness and precision; so also was the case of *Kavanagh* v. *Wilson*, above referred to.

In *Wait* v. *McNeil*, 7 Mass. 261, the Supreme Court of Massachusetts held that a verdict was not to be set aside, although it was given against the positive testimony of a witness, not impeached, where there were circumstances in evidence tending to lessen the probability that such testimony was true. Numerous other cases might be cited in support of the same general doctrine.

For the considerations mentioned, and the fact that the court below had the witnesses before it, and could thus better judge of the credibility to which they were entitled, we are not prepared to hold that its finding was not justified.

Its judgment is, therefore, ·                              *Affirmed.*

Mr. Justice Brewer dissenting:

I am unable to agree with the conclusions reached by the court. They seem to me to be in the face of positive, unim-

peached and uncontradicted testimony. The single question is one of fact, whether the petitioner was born in this country or not? On the hearing he was represented by counsel; so was the government. He testified that he was sixteen years old, was born on Dupont Street in San Francisco, and named the place on that street; that he lived there until he was ten years of age; and that he then went with his mother, on the steamer Rio de Janeiro, to China. With them on the steamer were three friends of the family, whose names he gave. His father, who was also a witness, testified that the boy was born in San Francisco, at the place named, No. 1030 Dupont Street; that he remained there until he was ten years of age; and that at that time he sent the petitioner, with his mother, back to China. He gave the day and the year on which the boy sailed. He gave as a reason for sending his wife and son back to China, that his parents were old, and as he could not go himself, sent her to attend on them. He produced his store-book on which appeared an entry of the purchase of the tickets for the boy and his mother, an entry of date the day before that on which the steamer named sailed. No witness was called to contradict this testimony. They were the only witnesses. The only thing which makes against the boy's testimony, is the fact that he did not know a word of English. But is it strange that a boy born and brought up ir a Chinese family, and living until he was ten years old in that part of San Francisco which is practically a Chinese town, and then taken back to China, should know only the Chinese language? It is true he did not give the details of his boyhood in San Francisco; but no question was asked of him in respect to them. If the government, through its counsel, wished to discredit his positive testimony it was its province, on cross-examination, to question him as to his knowledge of various localities in San Francisco, and of events which happened during the time he claimed to have resided there. The books of the steamer, if accessible, were not produced to show that no such passengers sailed on the trip named. No attempt was made to contradict either father or son, or impeach either, unless the ignorance of the English language is to be con-

sidered as impeachment. The government evidently rested on the assumption that, because the witnesses were Chinese persons, they were not to be believed. I do not agree with this.