## LEE YUEN SUE v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. June 19, 1906.)

No. 1,262.

1. ALIENS—CHINESE — DEPORTATION PROCEEDINGS — CITIZENSHIP — BURDEN OF PROOF.

Where, in proceedings for the deportation of a Chinaman, he claimed to be a native-born citizen of the United States, the burden of proof of such fact was on him, as provided by Act May 5, 1892, c. 60, 27 Stat. 25 [U. S. Comp. St. 1901, p. 1319], and Act Nov. 3, 1893, c. 14, 28 Stat. 7 [U. S. Comp. St. 1901, p. 1322].

[Ed. Note.—Citizenship of the Chinese. see notes to Gee Fook Sing v. United States, 1 C. C. A. 212; Lee Sing Far v. United States, 35 C. C. A. 332.]

2. SAME—TRIAL—EXAMINATION OF ACCUSED.

Where the evidence in Chinese deportation proceedings left the question as to defendant's alleged citizenship in doubt, it was not error for the judge to cause defendant, accompanied by his counsel, to be brought before him, and to further examine defendant concerning the evidence.

3. SAME—EVIDENCE.

In proceedings for the deportation of a Chinese person, evidence *held* insufficient to establish that he was a native-born citizen of the United States.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

Daniel Landon, for appellant.

Jesse A. Frye, U. S. Atty., Alfred E. Gardner, Asst. U. S. Atty., and Edward E. Cushman, Sp. Asst. to Atty. Gen.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. Appellant was arrested by immigration inspectors in the state of Washington for being unlawfully in the country without any certificate of registration, and taken before a commissioner, who, upon hearing, ordered him to be deported. He took an appeal to the United States District Court, claiming to be a native-born citizen of the United States. When the case came before the court, it was regularly referred to a United States commissioner at Seattle, who took and reported the testimony of appellant. Pursuant to a stipulation, several depositions of witnesses were taken in San Francisco, and duly reported to the court, and the cause was regularly submitted. Before any decision was rendered, the judge caused appellant to be brought into court, and without the appellant or the interpreter being sworn, the appellant was interrogated by the court. Thereafter the court, not being satisfied or convinced from all the testimony, that appellant was born in the United States, entered a decree affirming the order of deportation. From this decree, the present appeal is taken.

The industry of counsel for appellant alleges 15 assignments of error, but his contentions really present but two grounds for the

consideration of the court: (1) That the evidence does not support the decree. (2) That the court erred in its procedure of interrogating appellant after the testimony had been submitted.

We are of opinion that the contentions of counsel for appellant cannot be sustained.

The statutes of the United States cast the burden upon appellant to prove to the satisfaction of the court that he was born in the United States. Act May 5, 1892, c. 60, 27 Stat. 25 [U. S. Comp. St. 1901, p. 1319]; Act Nov. 3, 1893, c. 14, 28 Stat. 7 [U. S. Comp. St. 1901, p. 1322]. United States v. Sing Lee (D. C.) 125 Fed. 627, 628; Chin Bak Kan v. United States, 186 U. S. 193, 22 Sup. Ct. 891, 46 L. Ed. 1121.

Appellant testified before the commissioner that he was born at 741 Commercial street, San Francisco, Cal., 26 years ago; that his father, whose name was Lee Quey Won, kept a Chinese grocery store on Commercial street in San Francisco, Cal., for 15 years; that his mother, whose name was Chong Shee, died when he was 4 or 5 years old; that appellant lived in San Francisco until he was 10 years old, and then moved to Portland, Or., with his father, where he lived for 11 years; that his father lived in Portland until 1897, when he went to China, where he now lives; that appellant has for the past 5 years lived in Seattle, Port Townsend, and Bremerton. The testimony of his witnesses tended, if free from doubt, to corroborate his own statement; but, to some extent, there was a conflict between his testimony and some of the witnesses, enough, at least, to create a suspicion in the mind of the court as to the truthfulness of the testimony.

Appellant, after his arrest by the immigration commissioners, had procured from San Francisco, Cal., a copy of a paper purporting to be a birth certificate, issued July 23, 1902, which was filled out upon a blank requiring the "name of physician or midwife," the answer not being given, except "Remarks: Affidavit of Jim Roy and Charles A. Bond." This affidavit was sworn to before a notary public in San Francisco, and stated that Lee Yuen Sue "is a native-born citizen of the United States, having been born in San Francisco, California; * * * that your affiants cause this affidavit to be prepared to facilitate the travels of the said Lee Yuen Sue. Signed and sworn to September 5, 1902." In the certificate of birth appears: "Date of birth, May 5th, 1880." In appellant's testimony before the commissioner when he was charged with being unlawfully in the country, he was asked:

"Q. Where did you get this paper? A. San Francisco. Q. Were you in San Francisco when you got this paper? A. No. Q. How did you get the paper? A. Lee Mee [his cousin] got it for me."

This paper was not legal evidence. It was not prepared as required by law (Deering's Ann. St. & Codes Cal. 1903, §§ 3075, 3078), and was of no force whatever as a legal document. The facts were brought out before the court by the testimony taken immediately after his arrest, and were certainly sufficient when read by the court, to induce a close examination of all the testimony taken in the case.

The testimony of one of appellant's white witnesses contains statements which appear incredible upon their face. This witness testified, among other things:

That he had lived in San Francisco 29 years, and had been employed in Chinatown 19 years as doorkeeper in the Broadway Theater, and that he personally came in contact with many Chinese during all that time. "Q. Did you know a Chinaman by the name of Lee Yuen Sue? A. Yes, sir. Q. Where was he born, if you know? A. I was informed by his father that he was born in this city. * * * Q. When did you last see Lee Yuen Sue? A. About three years ago, in this city."

He further testified that he knew appellant's father and mother, and had frequently seen the boy in his father's store and recognized his photograph attached to the interrogatories in the depositions. Upon his cross-examination he testified:

That this was "the fifth time" he had been called upon to testify in Chinese cases "as to the place of birth of the Chinese. * * * I was simply asked to come here when they called the persons to my recollection, if I recollected them, the same as in this case." That appellant "went away from here some 15 years ago, and for 12 years I did not see him at all up to 3 years ago. * * * Q. And during that time you were not acquainted with him? A. No, sir. Q. Did you know him when he came back to San Francisco at the end of 12 years? A. He came there and spoke to me, and I did not know him. He told me who he was, and called things to my recollection, and mentioned his father, and he told me that he had been in Portland and was going to China or somewheres. * * * Q. He stopped you and particularly called your attention to the fact that he was Lee Yuen Sue, on this occasion? A. Yes, sir. * * * Q. Did he call your attention again to the fact that he was born in the city and county of San Francisco? A. Yes, sir. * * * Q. He stopped you and told you all about his father again? A. Yes, sir. * * * Q. If you did not know Lee Yuen Sue when he came back and reported to you three years ago, how do you know that you ever saw him when he was young? A. Because he called my attention to things when I did know him. Q. What did he call your attention to? A. I kicked him out of the theater one morning when I was doorkeeper of the theater. Q. You remember that distinctly? A. Yes, sir. Q. That was 15 years past? A. Yes, sir. I had forgotten the circumstance."

The above is sufficient to illustrate the character of all this testimony on these and similar points. When the court, after the case was submitted, read over the testimony, it evidently noticed that there were some discrepancies, some conflict therein, and that much of the testimony was in the nature of hearsay, and unsatisfactory. If the court had acted upon it, he would doubtless have entered an order of deportation, but in order to ascertain the truth, the court deemed it proper to call appellant and give him an opportunity to explain matters. This action was favorable to appellant. It does not involve any question as to the regular methods of procedure in the trial of ordinary cases. When appellant was brought before the court his counsel was present, and the court proceeded to ask appellant several questions, to which no objection or exception was taken. Among other things, the following:

"Q. In your previous statements you have said that this paper was obtained for you by a cousin of yours who is now in China, and that he sent it to you when you were in Seattle, how do you explain that? A. I did not remember about it. Q. When you were in San Francisco at the time of

receiving this paper, did you meet any white men there that you knew? A. Yes, I met Charley Bond and Jim Roy. Q. Did those two men go with you to the recorder's office when you obtained this certificate? A. Yes; they are the men that went with me. * * * Q. Do you remember anything that happened in San Francisco when you were a little boy, before you left San Francisco to go to Portland? A. No; I do not remember. * * * Q. Did you ever go to a Chinese theater when you were a child without your parents being with you, and were you ever chased away from a theater when you were there? A. No; I never been chased away. Q. Did the doorkeeper ever kick you out from a Chinese theater in San Francisco when you were a little boy? A. No. Q. When you were in San Francisco at the time of obtaining this certificate did you meet a white man who was doorkeeper in a Chinese theater, and talk to him, and tell him anything about kicking you out of a Chinese theater when you were a little boy? A. No; I did not."

This testimony explains itself. The court in rendering its decision said:

"The testimony in behalf of the appellant to support his claim that he is a native of San Francisco is not convincing, and for that reason I am unable to make a finding in his favor."

The rule in this class of cases is universal:

"That the judgment of the District Court should not be interfered with unless the case shows clearly that an incorrect conclusion has been reached." Lee Sing Far v. United States, 94 Fed. 834, 837, 35 C. C. A. 327; Woey Ho v. United States, 109 Fed. 888. 48 C. C. A. 705; United States v. Leung Sam (D. C.) 114 Fed. 702; Lee Ah Yin v. United States, 116 Fed. 614, 54 C. C. A. 70; United States v. Lee Huen (D. C.) 118 Fed. 442, 457 et seq.; United States v. Sing Lee (D. C.) 125 Fed. 627, 629; Chew Hing v. United States, 133 Fed. 227, 61 C. C. A. 281; Mar Sing v. United States (C. C. A.) 137 Fed. 875, 876; Quock Ting v. United States, 140 U. S. 417, 420, 11 Sup. Ct. 733, 851, 35 L. Ed. 501.

In Woey Ho v. United States, supra, this court said:

"It is true that in all the Chinese cases this court has been enabled and taken pains, to point out the unreasonable, improbable, and unsatisfactory points in the testimony which justified the trial court in disbelieving it. This duty, however, rests with the trial courts, and, in a certain sense, may be said to be optional with them. If no reasons are given for their action, this fact does not of itself furnish a sufficient ground to justify a reversal. Error must affirmatively appear. This court cannot assume that the court below acted arbitrarily in refusing to believe the testimony of any witness."

Speaking of the burdens cast by the law upon this class of aliens, the court, in Chin Bak Kan v. United States, supra, said:

"The legislation, and the circumstances considered, compliance with its requirements cannot be avoided by the mere assertion of citizenship. The facts on which such a claim is rested must be made to appear. And the inestimable heritage of citizenship is not to be conceded to those who seek to avail themselves of it under pressure of a particular exigency, without being able to show that it was ever possessed."

The suggestion made by appellant's counsel that the court acted arbitrarily is absolutely without foundation. The conclusion reached by the court is fully sustained by the evidence.

The decree of the District Court is affirmed.