## UNITED STATES v. ONG DEILK.

District Court, W. D. New York.
March 9, 1931.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Joseph J. Doran, Asst. U. S. Atty., of Rochester, N. Y., of counsel), for the United States.

Oscar J. Brown, of Syracuse, N. Y. (John J. Scully, of Rochester, N. Y., of counsel), for defendant.

ADLER, District Judge.

The defendant was arrested on November 8, 1929, charged with unlawfully residing in the United States in violation of section 3 of the Act of May 5, 1892 (8 USCA § 284), commonly known as the Chinese Exclusion Laws. He claims to have been born within the United States and consequently to be a citizen thereof. He is a person of Chinese descent, and admittedly is in the United States without right unless, as he claims, he was born in this country. The burden is upon him to establish his nativity to the satisfaction of the judge. Wong Chung v. United States (C. C. A.) 244 F. 410.

The question presented is whether the evidence before the court is sufficient to show that the defendant is a citizen of the United States.

He was first examined at the time of his arrest by the immigration inspector. At this examination he was informed that the purpose of the inquiry was to give him an opportunity to show whether or not he was entitled to remain in the United States. He was represented by counsel at this hearing. Later, on the hearing before this court, the defendant took the stand and testified at some length in his own behalf. At an adjourned date he produced two witnesses who testified concerning the claim of the defendant that he was born in the United States.

The defendant's story is that he was born in San Francisco, Cal., in 1891 or 1892, and is 38 years old. On his first examination he said he was born at 49 Oban street, and, when he testified later before the court, he stated that he was born at 85 Du Pont street, that his father died when he was a little boy, and that he had no brothers or sisters. After his father's death, he stated he went to live with a cousin or an uncle named Henry Sing on a farm near San Francisco. On one examination he testified that he remained on the farm until he was 13 years old, and when he testified before the court he said that he left the farm when he was 7 or 8 years old. From there he went to San Francisco, where he testified he stayed for a few years, living with a cousin named Charlie Sing on Clay street. In San Francisco he went to Sunday school and there had American and Chinese teachers. When he was 14 or 15 years old he went with Charlie Sing to New York City, where

he remained between eight and nine years, when he went to Reading, Pa. During this New York period he worked for a time in a laundry at Patterson, N. J., and while there in 1918 registered for the draft. He worked in laundries in New York, and, when he went to Reading, Pa., he worked in a laundry there. He remained in Reading three or four years, and while there went to church and Sunday school. From Reading he went back to New York and worked in a laundry for some time, when he came to Rochester. He had been in Rochester working in a restaurant for about a year before he was arrested.

The defendant produced none of the persons with whom he lived in San Francisco or on the farm or with whom he came in contact during his residence in New York or Reading or Patterson. He cannot read or write English. He can understand and speak English only very slightly, and his testimony was taken through an interpreter. There are a number of contradictions and many curious lapses in his testimony. He could remember practically nothing about his boyhood. He could not tell how far the farm was from San Francisco or anything about the farm or what they did there, although he said that he had been on the farm until he was 13 years old. He could give no idea of its location. He could not give the name or whereabouts of any of the persons he met in San Francisco when he was living there and went to school there, although he says he was 14 or 15 years old when he left San Francisco for New York. He said that no one ever told him anything about his father or his mother except that they were dead; that he never heard what his father did or where he lived.

Two witnesses were produced on behalf of the defendant, both of them Chinese. Both of them reside in Rochester, the place of defendant's last residence, and have known him there for some time. One of them testified that he knew the defendant's father in San Francisco, and that he attended the festivity of the son's first haircut when he was about a month old; that he left for Chicago about a year after that and did not see defendant again until he saw him in Rochester about a year ago; that he had never had any communication with the defendant's father or mother all these years; and that, when defendant's name was told to him, it came to his mind that he was the boy he knew in San Francisco. The substance of this witness' testimony is that thirty-seven or thirty-eight years ago he went to a ceremony or festival at which a son of Charlie Ong's was christened; that he left San Francisco shortly after and did not know or hear anything about these people until about a year ago, when the defendant was introduced to him and he was told that the defendant was Charlie Ong's son.

The other witness who also lived in Rochester testified that he knew Charlie Ong in China and afterwards in San Francisco; that he went back to China, and that, when he returned to San Francisco in 1898, a friend told him that Charlie Ong was dead, but that he had left a boy; that he came to San Francisco after having been in Nevada in 1905, and there saw the defendant; that he did not know where the defendant lived at that time or what he was doing; that he talked with the boy, but the boy paid little attention to him; that he did not see him again until about five years ago in New York City, and has seen him more recently in Rochester and Syracuse. His testimony was that the only way that he knew the defendant was a son of Charlie Ong was that some one told him, and that later, when he saw the defendant in New York about five years ago, he spoke to the defendant, and the defendant told him his name and his father's name.

A careful examination of the testimony of these witnesses discloses that there are discrepancies and contradictions of a serious character. The testimony of the defendant is so indefinite as to his early life, his movements, and his occupation that it is difficult to give credence to his story. It is impossible that any boy of anywhere nearly normal mentality could know or remember so little of his life up to the age of 16 years. In what little he did tell he contradicted himself several times. It is not so many years ago that he lived in San Francisco or its near vicinity, and, if he had been able to produce any one who knew him there during the days of his boyhood and who would be able to testify as to his life and origin there, such testimony might go far, if credible, toward determining his place of nativity. But there is no such testimony in this case. The two witnesses he produced were acquaintances and associates of his life in Rochester where he has been arrested for a violation of the Harrison Narcotic Act. Their testimony is at best very sketchy and vague so far as their actual knowledge of his parentage is concerned. Under all the circumstances I do not think it is entitled to credence. At the best it was practically all of it hearsay of a vague character, and I consider that it is of no force or value in determining the nativity of the defendant. Quock Ting v. United States, 140

U. S. 417, 420, 11 S. Ct. 733, 35 L. Ed. 501; Wong Chung v. United States, supra; Toy Wing Yow v. Nagle (C. C. A.) 24 F.(2d) 203.

My conclusion is that the defendant has not established his nativity to my satisfaction, and he is hereby remanded to the immigration authorities for deportation under the provisions of the Chinese Exclusion Laws.