MARGARITA BIAGGI, Plaintiff and Appellant, *v.* HEIRS OF ANGELINA ESBRÍ WIDOW OF BAUZÁ ET AL., Defendants and Appellees.

No. 10032.   Argued February 15, 1950.—Decided May 26, 1950.

Carlos E. Colón for appellant. Rafael Hernández Matos and Ramón G. Goyco for appellees.

MR. CHIEF JUSTICE DE JESÚS delivered the opinion of the Court.

The appellant brought this suit for execution of a deed against the Heirs of her mother Angelina Esbrí widow of Bauzá. She alleged that her predecessor died in December 1946; that the plaintiff lived with her and that the latter borrowed, in separate amounts, the sum of $2,730; that in order to pay said sum, Mrs. Esbrí agreed to convey to her two urban properties which are described in the complaint and to that effect gave instructions to notary Agustín E. Font to prepare the deed; that as soon as the contract was completed, the plaintiff took possession of the property and started to collect the rent from December 1946, precisely the same month when the alleged vendor died without executing any document; that she requested the other heirs to comply with the contract of the deceased but since they refused, she prayed for judgment accordingly.

The defendants filed their answer in which they denied the essential allegations of the complaint.

The court *a quo*, after receiving extensive evidence, decided that Mrs. Esbrí had never agreed with the plaintiff to give her the two properties in payment. This is the fundamental question in the present appeal. In support thereof, appellant assigns four errors. Three are directed against the weighing of the evidence and the remaining one consists in not having admitted the plaintiff's testimony in connection with the alleged transactions between her and the deceased.

■■ We shall commence the discussion by making a summary of the evidence introduced by the plaintiff.

The plaintiff lived with her mother until the latter's death; the daughter had lent her mother different sums amounting to $2,730, and Mrs. Esbrí, wishing to pay said debt, had agreed to transfer two lots located in the city of Ponce. To that effect the mother gave instructions to notary Agustín E. Font so that he would proceed to prepare the pertinent documents. The notary advised her to make a plan of the lots, as they had to be segregated from a larger property, which she asked surveyor José Serra Gaztambide to do, which drawings were delivered to said notary, who did not prepare the documents because of Mrs. Esbrí death.

Did the court *a quo* err in not believing this evidence? Attorney Font testified that Mrs. Esbrí had called him to her house to ask him if she could sell some lots in spite of the mortgage thereon. Although at the beginning of his testimony he admitted that Mrs. Esbrí had told him to prepare the deed of sale in favor of the plaintiff, later he rectified by denying that mention was made of preparing any deed for that purpose.

Serra Gaztambide, the surveyor who was commissioned to prepare the drawings, testified that he received an unsigned note in which he was asked to prepare them; that the note was delivered to him personally by Mrs. Esbrí's collector who told him that it was sent by Doña Angelina; that

as it was not signed, in order to verify its authenticity, he called Mrs. Esbrí, who confirmed over the phone the contents of the note but that he was not familiar with her voice.

Herminio Velázquez testified that he was Mrs. Esbrí's collector; that she had informed him of the agreement with the plaintiff; that Mrs. Esbrí dictated a note to him for Serra Gaztambide, which he personally took to the latter; that several days later, at the request of Mrs. Esbrí, he delivered to Serra Gaztambide the sum of $30, cost of the drawings, and on receiving the latter, he handed it to Attorney Font.

Rafael Rivera Esbrí testified that he was Mrs. Esbrí's nephew and manager and adviser of the plaintiff; that on a certain occasion while he was at his aunt's home together with Attorney Font, she told the plaintiff that she had just given the data to said attorney so that he would prepare the deeds in her favor, but that the attorney had indicated to her the need of having a plan made, which she intended to order; that certain properties were conveyed by said deeds to the plaintiff as payment for a debt; that after Mrs. Esbrí's death, he obtained a copy of the plan from Attorney Font and at the latter's suggestion he chose Attorney Colón to bring the present suit.

Pedro Archevald and Josefa Colón, who were tenants of the houses located on the lots involved in this suit, testified that Mrs. Esbrí had told them before her death, that she had sold the lots to her daughter and asked them thereafter to pay the rent to the new owner.

Angel Prado, Mrs. Esbrí's son-in-law, as witness for the plaintiff, confined his testimony to identifying a letter that he had written to the plaintiff and which she presented and was admitted in evidence.[1]

---

[1] The letter sheds so much light on the matter and must have had such weight in the weighing of the evidence that we believe it pertinent to copy it:

"Dear Margot: Falin informed me that you had an argument over the telephone by reason of the complications in the inheritance of doña

According to defendants' evidence, Mrs. Esbrí knew how to write. Supposing it were true that she dictated to the collector the note she sent Serra Gaztambide, it does not explain the reason why, at least, she did not sign it. Did it not occur to her that an unsigned note could not be accepted as authentic? But it also appears from Angel Prado's testimony, as witness for the defendants, that Mrs. Esbrí was so deaf that in order to talk to her one had to shout at her ear and for that reason she had not been able to talk over the phone for years. Being so, how could the judge give credit to Serra Gaztambide's testimony regarding his conversation with Mrs. Esbrí, especially, if Serra did not know her voice? Does it not seem more reasonable that if she did

---

Angelina and that in your argument I was mixed up in something connected with some promissory notes of the 'Crédito y Ahorro Ponceño'. I want to give you a brief explanation of the whole matter. Please be calm and read this as many times as you wish and you may show it to whomever you please, but I think you should read it well and then do as you think best, as I do not want you to think in any way that I am trying to make you desist from your plans. Be sure to understand well what I want to tell you for it is not my intention that this letter should serve as someone's instrument and that sisters should be estranged from each other for a few pennies which after all, mean nothing in this world.

"This matter should have been already settled instead of spending money on attorneys and law-suits which does not benefit anyone but does us great harm. I cannot believe that you are thoroughly informed as to how you have handled your affairs heretofore, and you can be sure that the matter is not clear and I shall tell you why. According to the court's record you claimed at the outset $2,730 which you alleged your mother owed you. As far as I know this was never denied and in conversations in which I participated it was decided to recognize it as far as Mary and Deadina were concerned. As to the other party we cannot force them to recognize it. Before considering this point and without any reason you filed a complaint claiming some lots in payment of the debt, which complaint was dismissed because it was defective and a decision I believe is still pending in the Supreme Court.

"I want you to know that such sale could not have been effected because those lots like everything else were and are mortgaged and a mortgaged property cannot be sold without the consent and approval of the mortgagors so that any proposed deed is void when the parties concerned have not intervened or signed it. In such complicated matters as this, if the instrument is not legalized, it is void. Besides, if you win you could only get, at most, what you claim she owed you, that is, two or three thousands, and perhaps you shall have spend more than that in

not want or could not write, she would dictate the note to her own daughter, the plaintiff, who lived with her and managed her affairs? But there are other circumstances highly suspicious in the present case. Before filing this action a petition for judicial administration was filed by the plaintiff in the lower court. In this proceeding the liabilities and assets of the estate were reported. The alleged debt of $2,730 to the plaintiff did not appear among them. Likewise, it was not stated that the lots had been sold to her. On the contrary, they appeared as property belonging to the estate. It was some time after the petition for judicial administration was filed that Rafael Rivera Esbrí asked attorney Font to amend the petition so that said debt should

expenses and years of litigation.. This is the truth and nothing but the truth and if you do not believe me consult other persons whom you know have no prejudice against any of you.

"As to the promissory note, I was your mother's surety for the sum of three thousand five hundred dollars of which she only owed $800 or something like that, at her death and which was paid. And when I noticed that the note claimed by the bank was not the blank note I had left signed when I went to Spain, I was surprised and started to look for said document and found it. Said document was filled in by a bank employee but when getting doña Angelina's signature I do not know why but it appears signed Angelina E. Bauzá, but it is not her handwriting, it is yours and said note was not accepted at the bank. You could not do that in an official document and use my signature or sign for her even if you had a power of attorney, for with the power of attorney you may sign her name and yours under it, but in a clear handwriting and without trying to do any imitations. That cannot be done, it is a crime and an attorney-in-fact cannot convey to himself any thing belonging to the person who conferred the power of attorney. That is another crime. I, of course, do not intend to use this document against you because that would only result in a scandal with benefit to no one and I do not act that way.

"You must realize and examine your conscience as to which way you will choose without pleasing anyone. I know well what all these embroilments and lawsuits lead to, and they should only be brought up as a last resort. I think I am entitled to give you some advice for though you might have forgotten I believe I have helped you to solve several matters as well as the rest of the family without staining my hands with a single penny. I fixed Carlos' matter in a month, I also fixed Julio's matter in six, which was a more delicate matter than this. Now you cannot come to an understanding and are spending the money on lawyers who are the ones to profit. You are being foolish and you shall regret it later.

appear. If as witness Rivera Esbrí testified he was attorney-in-fact and adviser of the plaintiff and was present when his aunt told plaintiff that she had given instructions to Attorney Font to prepare the deeds on the lots, is it not inconsistent with said statement to request that the debt be included and not ask that it be stated in the judicial administration proceeding that the properties described in the complaint belonged to the plaintiff herein, by virtue of an agreement between mother and daughter? In *Cintrón* v. *Cintrón* 70 P.R.R. 734, which dealt with a simulated sale performed by a father in behalf of a daughter with prejudice to his other heirs, we said:

"Now what about me who paid for doña Belén's funeral and the lot where she and your mother are buried, and as yet I have not received one cent from any of you? It would certainly be shameful if I had to go to court, but I have waited years and perhaps I have been taken for a fool. Again I ask you when your mother needed money from the bank, whose signature' did she get and who gave it to her? I did and there is the proof. You know of course, that I have never lived on another's money and that I never depended on my wife. I have lived from my own work and' whatever she inherited from her father is free of debt and I believe she has travelled like very few with my money and she knows that I do not want or ask anything for myself, but I shall let no one make a fool of us. Margot, stop and think. Do not please those who thrive on confusion, do not throw your money away, enjoy it by travelling and making your own life, do not be a fool. The wise or those who boast of being wise by making the family quarrel are contemptible persons.

"I know what all these embroilments can lead to, one does not need to be a lawyer. Common sense and your conscience will tell you.

"Do not let yourself be carried away by impulse and you will see that you can still live happily the rest of your life and not throw your money away but spend it wisely making your own life happy instead of bitter.

"Consider this and you will see that what I tell you is the truth and if you insist in throwing yourself along a precipice I am very sorry and you will see that you will gain nothing by it in the end but only many headaches. I close by advising you to meditate and try to settle the matter in a satisfactory way, I shall not resort to lowliness or anything of that sort. That is why I tell you that in order to litigate one must have a good memory and papers. Anything else is foolish. I hope you do not become angry and agree with me. As ever, affectionately yours, (Signed) Angel."

"We should not lose sight of the well-settled principle that transactions between close relatives that might prejudice other persons, should be examined with caution. *Mackall* v. *Mackall,* 135 U. S. 167."

Under all these circumstances, we do not agree with appellant's view that the trial judge erred in weighing the evidence. Far from that, his wise and sound conclusions in all respects reveal a careful and elaborate study of the case. *Caballero* v. *González,* 53 P.R.R. 513; *Navarro* v. *Compañía Azucarera "El Ejemplo",* 53 P.R.R. 692, and *Quock Ting* v. *United States,* 140 U.S. 417, are cited by the appellant to maintain that since appellant's evidence was not contradicted, the court was bound to give it full credit. Such is not the scope of the doctrine prevailing in those cases. The rule is to the effect that the courts cannot disbelieve a witness whose testimony has not been contradicted unless there exists reasonable grounds for not believing it. In the present case, the trial court had reasons to doubt the veracity of the witnesses, and this being so, assuming that no evidence was introduced to contradict them, their own testimony discredited their evidence.

■ The fact that while witness José Serra Gaztambide was testifying, the judge stated that he did not wish to take part in the case because he could not believe that witness because of the manner he had testified in another case before him, is no reason for reversing the judgment for as we have seen, the witness's testimony is so suspicious that even without the alleged prejudice, the judge would have been justified in not believing him. But furthermore, when the judge so stated at the trial, appellant's attorney insisted on the judge's intervention and vowed his absolute faith in the judge's honorability. In such circumstances, we do not see how he can contradict himself when the outcome of the trial is adverse to him.

We shall now consider the remaining error.

■ When the plaintiff tried to testify on the transac-

tions had with her mother, the defendants relied on § 3 of the Act of March 10, 1904 [2] to object to her testifying on the said point. The court sustained the objection and that is the ruling that appellant points out as an error. She invokes *Boscio* v. *Vilá*, 67 P.R.R. 567, and maintains that it reversed the principle established in *Wilcox* v. *Axtmayer et al.*, 23 P.R.R. 319. There was no such reversal. In *Wilcox, supra,* the complaint was filed against Henry Axtmayer and the heirs of his father Jacob Axtmayer, and it dealt with an action for attorney's fees in which it was alleged that Jacob Axtmayer had promised to pay the plaintiff for professional services rendered to his son Henry. The same Section now invoked by the appellant was relied upon then and the opposition to Wilcox' testimony on the agreement between him and the deceased Jacob Axtmayer with respect to the payment for professional services was sustained. The *Wilcox* case, *supra*, is clearly included within the provisions of § 3 copied in note 2, as it involved an action against the heirs of Jacob Axtmayer based on settlements had with the deceased. In *Boscio* v. *Vilá, supra*, the facts were different from *Wilcox, supra*, for it involved an action brought by a stepmother against her stepdaughter to recover the widow's share and her share of conjugal property in a house that was claimed to have been conveyed to the defendant by the plaintiff and her husband under a simulated sale. When the plaintiff tried to testify on the agreement reached between her and her husband with the defendant, the latter objected, citing the afore-mentioned § 3. The court sustained the objection and since the plaintiff stated that she did not have

---

[2] Section 3 of the Act of March 10, 1904, provides:

"In actions *by or against* executors, administrators or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this section shall extend to and include all actions *by or against the heirs or legal representatives of a decedent* arising out of any transaction with such decedent." (Italics ours.)

any other evidence to support her case, it dismissed the complaint. An appeal was taken and this Court stated that if the plaintiff eliminated her claim to the widow's share, the afore-mentioned § 3 would not be applicable then, inasmuch as the plaintiff would then limit herself to claim her share in the community property and in such case she would be claiming that to which she was entitled by her own right, that is, not as her husband's heir, against a party who was not sued as her father's heir, but for the alleged title of ownership which she held by virtue of the simulated sale. As to the widow's share, *Wilcox, supra,* was followed.

In the present case, the situation is the same as in *Wilcox v. Axtmayer, supra.* The plaintiff does not bring her action as her mother's heir, but by virtue of the title she claims to have acquired through the alleged contract with her mother and the action is directed, as in *Wilcox,* against her mother's heirs. So that it deals with an action brought against the heirs of the person with whom the alleged agreement was reached. This being so, the plaintiff's testimony in relation to the transaction had with Angelina Esbrí falls under the prohibitions of the afore-mentioned § 3 and the lower court did not err in excluding it.

The judgment will be affirmed.

Mr. Justice Snyder did not participate herein.