## MADISON v. MATSON NAV. CO. et al.
### No. 13531.

United States District Court
S. D. California, Central Division.
March 24, 1952.

Herbert Resner, Los Angeles, Cal., for libelant.

Lasher B. Gallagher, Los Angeles, Cal., for respondents.

YANKWICH, Chief Judge.

The above-entitled libel, heretofore tried, argued and submitted, is now decided as follows:

Judgment will be for the respondents that the libelant take nothing by the said libel against the respondents or either of them, and that the said libel be dismissed without costs.

Findings and decree to be prepared by proctors for the respondents under Local Rule 7.

### Comment

The action was by a longshoreman, Kermet H. Madison, under the general maritime law, U. S. Constitution Art. III, § 2; Atlantic Transport Co. of West Virginia v. Imbrovek, 1914, 234 U.S. 52, 62, 34 S.Ct. 733, 58 L.Ed. 1208; Parker v. Motor Boat Sales, Inc., 1941, 314 U.S. 244, 246–250, 62 S.Ct. 221, 86 L.Ed. 184; American Stevedores v. Porello, 1947, 330 U.S. 446, 456, 67 S.Ct. 847, 91 L.Ed. 1011,—for injuries sustained while he was removing the middle strongback from the 'tween deck of No. 4 hold of the American steam vessel Hawaiian Wholesaler.

The libelant attempted to prove (1) negligence in failing to keep the passageway clean, and (2) unseaworthiness in failing to provide a safe place to work,—more

particularly, in failing to provide a railing around the hatch.

■■ Recovery on the first ground required positive proof of negligence. See the writer's opinion in Gelb v. United States, D.C.Cal., 1948, 75 F.Supp. 833, 834. The second ground required proof of failure to provide a proper place to work or equipment which resulted in the injury.

The situation presented is a factual one only.

A study of the evidence,—a good portion of which the Court has caused to be transcribed by the Reporter,—leads to the conclusion that the libelant has failed to prove grounds for recovery on either theory.

The accident happened while a stevedoring crew was taking out the strongback under the gear. It is the libelant's theory that he slipped and fell when he got hold of the tag line after the winch driver had lowered the bridle. He testified:

"The Witness: The winch driver lowered the bridle, see, and I got hold of the tag line and just as I leaned down to hitch it up, I slipped. There was crude sugar was all I could say I slipped on and that's all I remember.

"Q. And what happened to you? A. And I fell down to the lower hold. I don't know, it just happened so quick.

"Q. Now, were there any railings around the hatch? A. No, no protection whatsoever.

"Q. Were there any hand holds behind you on the bulkheads or on the reefer section or on any of the doors of the reefer section? A. No."

He fell against the shaft alley below. He testified:

"Q. Now that shaft alley was about anywhere from ten to fourteen feet from the edge of the hatch coaming on the port side, wasn't it? A. Well, you can't ask me because after all, I just knew I fell against it.

"Q. What I am getting at, Mr. Madison, is the fact that you did come in contact with the shaft alley? A. I did.

"Q. On the way down? A. Yes, I did.

"Q. Is that the first thing you came in contact with? A. Yes.

"Q. You didn't hit anything else before you hit the shaft alley? A. Not that I recall.

"Q. Well, how far from the coaming were you when you let go of the cable? A. I am supposed to be falling and measuring everything.

"Q. No. You had hold of the cable, didn't you? A. Not the cable, no, the tag line.

"Q. Did you have hold of the bridle at any time? A. Not that I recall.

"Q. Did you take hold of the toggle or the chain at the end of the bridle at any time? A. No. I think I started to hold the tag line.

"Q. You think you started to hold the tag line? A. I knew I had hold of the tag line.

"Q. How long did you hang on to it? A. I am supposed to have the time? And everything too?

"Q. Which way was the bridle going the last time you had hold of it? A. He had pulled it to my side and was throwing to the other side over to the opposite side.

"Q. That is, you were throwing it over, or the winch driver was? A. I was helping him,—it's customary.

"Q. Well, how far from you was the bridle the last time you had hold of the tag line? A. I had hold of the tag line until I lost my balance.

"Q. You had hold of the tag line until you lost your balance? A. Until I slipped.

"Q. You just said you lost your balance. A. When you lose your balance, you slip too, don't you?

"Mr. Gallagher: I am not arguing with you.

"The Court: Did you feel any pull on the line before you slipped?

"The Witness: Not that I remember.

"The Court: Were you leaning over the hole?

"A. Yes, I was leaning over the hole.

"Q. By Mr. Gallagher: What were you leaning over for? A. I had hold—I had to lean over to get the bridle. They just don't throw it in the hole and say, 'Here'.

"Q. You were leaning over?' A. I had already stepped back after I got hold of it like this.

"Q. Didn't you just tell the Judge just now that just before the accident happened, you were leaning over? A. I was leaning over to get hold of it.

"Q. To get hold of what? A. The bridle.

"The Court: Then you stepped back.

"The Witness: I stepped back after I got hold of the bridle. Then I slipped when I stepped back."

His corroborating witness, Michael J. Howit, a longshoreman, who was working opposite him on the other side of the hatch, gave a different version of the accident. According to him, there was no slipping. Madison stepped from where he was onto the beam while holding onto the tag line. He tried to steady himself on the strongback and fell. He testified:

"Q. Will you tell us, Mr. Howit, just what you saw with regard to how this accident happened? A. I have to watch the man opposite me to see what he is doing, and also looking at the bridle, *with the winch driver bringing it across, and I saw Swede step out from the coaming, and he stepped from where he was onto the beam. He tried to steady himself on the strongback, and then he fell across from there to another strongback right opposite him, and —well, it happened so fast. He bounced off the strongback and hit on the shaft alley and he fell right down the other side of the ship. He bounced right down underneath the hatch there.* * * *

"Q. By Mr. Resner: How far did he fall altogether? A. Well, usually this was exactly headroom, and usually headroom is 8 feet. The ship came in from San Francisco partly loaded, and usually that is how most of them come in, loaded, down below, and then we top off, and just exactly that would usually be 7 or 8 feet. They have head room down there."

There is testimony that, despite all efforts of the crew to keep the passageways clear of sugar, there was some raw sugar in them. Unlike refined sugar, which is sandlike and slippery, the uncontradicted evidence is that raw sugar is viscous, —sticky. So that there is no possibility of slipping. Rather, one's feet would stick and impede one's motion. The manner of the libelant's fall, the distances his body traversed horizontally, his striking of the shaft alley below, indicate a forward fall caused either by an almost jumping or thrusting forward movement or by a dragging or pulling of the tag line. Indeed, in his libel, which he verified, the libelant alleged that the strongback bridle was inadequate, and was too short, and did not come down to the place where the libelant could safely reach and take hold of it. (Libel, Part IV, Subdiv. (1) and (2). The testimony of Howit and the physical facts surrounding the fall, the injury to his wrist and chest, show clearly that he fell forward and that there was no slipping. They rather confirm the conviction that either the libelant, underestimating the distance, came too close to the edge of the hatch, or that he held to the tag line too long, and, realizing that he was about to fall, he either allowed himself to be pulled by the tag line, or actually thrust himself forward. He stated: "When I started slipping, I dropped the tag line." Whichever of these alternatives took place, they do not spell negligence on the part of the respondents. The contradictions in Madison's story and between it and the version told by Howit, its improbability as shown by the surrounding circumstances, call for its rejection. See, Quong Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L. Ed. 501; Broadcast Music, Inc., v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 80. There is no showing that the passageway was inadequate in any other respect, or that the particular operation could have been carried on if the rail guard had been up, or that, in the circumstances, the presence of a rail guard would have avoided the accident.

So there is neither negligence nor unseaworthiness, and there can be no recovery.

Hence the ruling above made.