David COHEN et al., Plaintiffs,

v.

**SURREY, KARASIK & MORSE,**
**Defendant.**

Civ. A. No. 711–73.

United States District Court,
District of Columbia.

March 3, 1977.

Joseph A. Yablonski, Washington, D. C.,
for plaintiffs.

David N. Webster, Washington, D. C.,
William H. Schweitzer, Washington, D. C.,
for defendant.

## OPINION

WILLIAM B. JONES, Chief Judge.

This non-jury action was originally filed in the Court of Common Pleas of Philadelphia County, Pennsylvania. The case was removed to the United States District Court for the Eastern District of Pennsylvania. 28 U.S.Code §§ 1441, et seq. Subsequently the action was transferred to the United States District court for the District of Columbia pursuant to 28 U.S.Code § 1404(a). In the state of Pennsylvania and under its law the defendant law firm was sued as an entity and service obtained over the firm as an entity rather than by serving the individual partners. Rule 2128(a) and (b), Pennsylvania Rules of Civil Procedure. Just before the trial of this case on January 5, 1977, defendant firm moved to amend the answer to assert that under the law of the District of Columbia it could not be sued as an entity but the individual members had to be named and served. This motion was denied on the authority of *Van Dusen v. Barrack*, 376 U.S. 612, 639–40, 642–43, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

When instituted in the Court of Common Pleas of Philadelphia County, Pennsylvania, the complaint was set forth in two counts. Count 1 alleged assumpsit and Count 2 alleged trespass. In the federal courts under the Federal Rules of Civil Procedure there is only one form of action and that is known

as a "civil action." Rules 2 and 8, Federal Rules of Civil Procedure. The parties have properly recognized that this action in this Court is one asserting a claim for relief as a result of an alleged malpractice on the part of defendant law firm and the partners thereof as well as a breach of contract. Defendant firm filed its answer in the United States District Court for the District of Columbia after transfer here and it denied any wrongdoing and asserted several counterclaims. Those counterclaims will be treated in the latter part of this opinion. As noted, this case was tried by the Court without a jury.

Full discovery was entered into and full pre-trial briefing was conducted as required by Pre-Trial Order No. 1 entered by this Court. As a result of such pre-trial discovery and procedures required, the issues are as follows:

(1) Richard Kelly's criminal record was allegedly known to the defendant firm but not to the plaintiffs and that defendant firm failed to make known that record to the plaintiffs. This according to the plaintiffs breached their contract of employment with the defendant firm and also was the result of negligence and fraud on the part of the defendant firm.

(2) Checks were drawn by Kelly but payment was refused because of lack of sufficient funds, all of which according to plaintiffs was known to defendant firm but not to the plaintiffs and defendant firm failed in its duty to disclose such facts.

(3) Kelly claimed ownership or control of several companies which he stated had assets totalling as much as $50,000,000 and which produced an annual return of $5,000,000, when according to the plaintiffs actually Kelly did not own or control such companies, hence the claimed asset value and return were false, all of which was not known to the plaintiffs, but they alleged the defendant firm knew those facts and failed to disclose them to the plaintiffs.

At the close of plaintiffs' case, defendant firm moved for a dismissal of plaintiffs' entire action on the grounds that upon the facts and law plaintiffs had failed to show any right to the relief claimed. Plaintiffs' counsel candidly admitted that the record failed to show that Kelly's claim of ownership or control of the several companies was false or that the companies did not possess the claimed asset value and produce the claimed annual return. The Court's review of the record confirms that concession by counsel. Defendant's motion was, therefore, granted to the extent of dismissing the third issue but denied as to the other two claims.

Plaintiffs' trial counsel was brought into the case by plaintiffs just prior to the commencement of the trial. He had nothing to do with the pre-trial stages, including conferences with the Court. However, his predecessors along with the defendant firm's counsel advised the Court that this case could be tried in nine days if it commenced on January 5, 1977. The trial was commenced on that date and it became obvious after several days that it would be impossible to try both the liability question and damages in the time allotted. The Court therefore bifurcated the trial and limited the first phase to the question of liability.

### Factual Background

Chris-Craft Industries, Inc. (Chris-Craft) in 1970 found its management faced with a number of dissatisfied shareholders. The feeling of the latter was that the management had depreciated the value of the Chris-Craft stock. In February and August, 1970, there were two meetings in Chicago of dissatisfied shareholders. Plaintiffs Balsbaugh and Schnell attended at least one of those meetings and possibly two. Plaintiff David Cohen was present at both Chicago meetings. In 1970 Cohen held Chris-Craft stock, which had cost him approximately $1,000,000. Balsbaugh's original cost for the shares he held was $350,000, while Schnell's stock holdings were considerably less. At the Chicago 1970 meetings the shareholders present discussed their dissatisfaction with Chris-Craft management. Various approaches were considered including organizing a proxy contest to take over

control of the company. However, Cohen, who had some knowledge of a proxy contest, told those present of the rather substantial cost of such a contest as well as problems associated with it. The shareholders then present determined not to institute the proxy contest but rather to meet with management. That meeting subsequent to August 1970 meeting was held without any satisfactory result being achieved by the dissatisfied shareholders.

In late May or early June, 1971, Cohen learned of Richard Kelly's attempt to purchase Siegel's Chris-Craft stock interest. Siegel was the Chairman of Chris-Craft. Cohen also learned that Charles Reed, by that time a partner in defendant law firm, was Kelly's lawyer. Furthermore, Cohen was advised that Reed had drafted a form of letter addressed to Kelly for the purpose of having it signed by dissatisfied shareholders to the effect that they were unhappy with the way management was conducting the Chris-Craft business. The purpose of the letters was to strengthen Kelly's bargaining position with Siegel. Cohen signed such a letter with certain changes made by him and with the understanding that it would not be made known to management.

Cohen heard of a July 23, 1971, meeting between Kelly and Reed and Chris-Craft management, at which time Cohen was advised there was discussed Kelly's proposal to merge certain companies with Chris-Craft. In return for such a merger it was Kelly's proposal that he would receive a substantial block of Chris-Craft stock. A meeting was held in Cohen's Philadelphia law office on August 4, 1971. Among those present were Cohen, Kelly and Reed. Among the matters discussed were the efforts Kelly had been making to acquire a substantial interest in Chris-Craft as well as Cohen's experiences with the two 1970 Chicago meetings. Various alternatives were discussed, including a proxy contest. It was finally concluded at the August meeting that Kelly and Reed would continue the negotiations and keep Cohen and the others present advised.

On August 11, 1971, Kelly and Cohen met in New York after Kelly had had a meeting with Chris-Craft management. Kelly's description of the events of that meeting indicated on his part a degree of optimism that the merger proposal and other negotiations with management were not at an end. Either at the Kennedy International Airport or LaGuardia Airport in New York on August 26, 1971, Cohen, Kelly and Reed had a meeting. Kelly and Reed were on their way to Canada. Cohen came to the airport to meet with them with respect to the Chris-Craft matter. Thereafter, in defendant law firm's office in Washington a meeting was held on September 23, 1971. Present, among others, were Reed and Surrey of the law firm, as well as Kelly and Cohen, Balsbaugh and Schnell among the dissatisfied shareholders. There it was decided that the dissatisfied shareholders were to initiate a proxy contest for the purpose of removing the present management of Chris-Craft. Reed and Surrey explained to those present the meaning of a proxy contest. To aid in that explanation each dissatisfied shareholder present was presented with written material referred to as a book. Among other things, the material contained a form for each participant to make known his relative biographical data. It explained to participants that anything derogatory in their lives had to be revealed because it could be expected that management in a proxy contest could become aware of such facts and disclose them. At least one of the participants—a dissatisfied shareholder—determined not to participate in the contest because of his background. Other participants lost interest in the contest when they learned of the costs that would be entailed and the problems that would be faced. Only Kelly and the three plaintiffs expressed an interest in undertaking the proxy contest.

With respect to organizing the contest Cohen and Kelly each agreed to contribute $25,000 as well as each contributing an additional $25,000 if necessary. Balsbaugh agreed to contribute $7500 and Schnell $3712. Cohen expressed the belief that it could be expected that the "Wisconsin

group" of dissatisfied shareholders would be extending financial help to defray expenses while Kelly was of the view that institutional sources would also assist in defraying expenses. According to Balsbaugh, the September 23, 1971, meeting ended with the understanding that Kelly, Cohen, Balsbaugh and Schnell would each have a week to think over whether they wished to go ahead with the contest. In the event each decided to proceed with the contest, he was to make available to defendant law firm his contribution by October 1, 1971.

Cohen mailed his $25,000 check to the defendant firm on October 1 and thereafter asked Reed not to deposit the check until October 13. Balsbaugh on October 1 mailed his $7500 check to the defendant firm. Schnell presented his $3712 check to the firm on October 16, 1971 at a meeting. It was on the latter date that a second meeting was held in defendant law firm's Washington offices. Some time between September 23 and October 16, 1971, Kelly gave Reed two checks. A $15,000 check was dated October 25, 1971, while a $10,000 check was dated October 13 or earlier. All checks were payable to the account of the Independent Stockholders Committee.

At the October 16 meeting it appeared as though the three plaintiffs and Kelly had met their contribution pledges and the Independent Stockholders Committee was formally organized. Balsbaugh was chosen chairman of the committee. A number of resolutions were adopted and agreements entered into by the Committee. One of those resolutions provided for retaining defendant firm to represent the Committee in the proxy contest. Another resolution provided for opening a Committee bank account and authorizing the firm to draw on the account for proxy contest purposes.

In the Committee's agreement with the defendant law firm, it was provided that the firm would represent the Committee in the proxy contest and it would be compensated at their regular hourly rates. The Committee agreed to deliver a $25,000 retainer to defendant firm and it was provid-

ed that if the firm's fees did not reach $25,000 prior to the termination of their services, the difference would be rebated to the Committee. In the event the fees at the hourly rate exceeded the $25,000 retainer, the firm would bill the Committee for the excess on a monthly basis. Also the firm's out-of-pocket expenses for the proxy contest would be billed on a monthly basis.

In addition to adopting resolutions and entering into agreements, the Committee and counsel at the October 16 meeting discussed a number of matters pertinent to the proxy contest. During the meeting Kelly raised the question of his background possibly being a problem to the Committee and he offered to withdraw from participation. He made a disclosure of his background, the extent of which is in dispute and will be referred to later.

Under date of November 20, 1971, Chris-Craft management distributed to the company's stockholders a document which has been referred to in this case as a "fight letter." (Pltfs. Ex. 48.) That letter stated that David Cohen had claimed the protection of the Fifth Amendment before a Federal Grand Jury in Philadelphia. The Grand Jury was investigating the activities of the Teamsters League of Philadelphia and Vicinity. The fight letter stated that Cohen refused to testify. The Grand Jury's investigation encompassed possible income tax evasion "as related to a local Teamster official but collaterally as to any individual, including David Cohen." Accompanying the fight letter was a copy of an opinion and order of the United States District Court for the Eastern District of Pennsylvania denying the Government's motion to compel Cohen to testify before the Grand Jury and holding that Cohen's claim of privilege had been timely asserted and had not been waived.

The same November 20, 1971 fight letter stated that Richard Kelly in trying to take control of Polarad Electronics Corporation gave Polarad his personal check for $38,000, which check was returned unpaid because of insufficient funds.

Under date of December 2, 1971, a second fight letter was distributed by management to the company shareholders. (Pltfs. Ex. 52.) That letter again referred to David Cohen's asserting the Fifth Amendment privilege before the Philadelphia Federal Grand Jury. It also recited three convictions of Kelly. Two of those convictions were for issuing worthless checks. The first was a 1953 Asheville, North Carolina conviction and the second a 1961 Phoenix, Arizona conviction. As to the first conviction, the letter stated that Kelly, having failed to make restitution, was in 1954 sentenced to serve 90 days on a road gang. The Phoenix conviction according to the letter resulted from Kelly's pleading guilty and a six month jail sentence was suspended on condition that he make restitution.

The third Kelly conviction cited in the December 2, 1971 fight letter was on a finding of guilt in Wichita, Kansas, in 1960 of the offense of falsely advertising a cosmetic and drugs. According to the letter, Kelly was sentenced to 60 days in jail and fined $300. The letter further stated that in an unrelated SEC investigation, Kelly testified that he posted a bond and did not go back to Wichita.

A December 4, 1971 meeting in defendant's offices in Washington was attended by the four Committee members, who were also director nominees in the proxy contest, the other director nominees, Reed, Surrey, Michael Nussbaum, firm partners, and firm associates, Cherif Sedky and Mark Wolf. The principal matters discussed were the action initiated on December 1 by Chris-Craft against the director nominees in the United States District Court for the District of Delaware and the December 2 management fight letter. The complaint sought an injunction and money damages.[1] The view was expressed that the most serious allegations of the complaint were those against Kelly and his record, since the thrust of the claim was that the operating authority for the company's television stations would be placed in jeopardy. (See Def. Ex. 18.) Counsel expressed the opinion that Kelly's past record would have little or no effect on the issuance of any broadcasting license by the Federal Communication Commission. At the meeting Kelly described the charges against him and the background thereof. He offered to resign and he left the room while the director nominees, including the three plaintiffs, considered whether to accept the offer of resignation. They deferred the decision until there could be obtained an indication of the impact of management's December 2 letter on the shareholders to whom the letter was addressed. Never did the director nominees, including the three plaintiffs, decide to accept the resignation. However, Kelly on his own volition resigned on December 14, 1971.

As has been noted, it is plaintiffs' claim for relief that the defendant law firm did not reveal Kelly's criminal record or his issuing checks without sufficient funds to cover them. Plaintiffs assert that if they had known of those facts they would never have associated themselves with Kelly in the proxy contest. They do not assert that that record or the returned checks caused them to lose the proxy contest at the January 11, 1972 shareholders meeting.

### 1. Kelly's Criminal Record

From the evidence in this case it is found that the first time any one in the defendant firm knew of Kelly's criminal record was when Charles Reed learned of it in September, 1970. Reed at that time was a member of another law firm. He represented Kelly in a Securities and Exchange Commission (SEC) investigation in the matter of First Liberty Fund, Ltd. and others. There Kelly appeared as a witness; no charges had been filed against him. (Pltfs. Ex. 6.) The hearing was in Fort Worth, Texas. At that hearing Kelly testified that he had been arrested and formally charged

---

1. By their answer the defendants sought similar relief in their counterclaims. In January, 1973, the Court refused to lend its aid or grant the relief requested to either opposing party since it found both parties guilty of illegal conduct in violation of the federal securities laws during a proxy contest.

with issuing insufficient fund checks in 1959 in Phoenix, Arizona. However, he further testified that he assumed that the charges were dismissed, since to his knowledge he wasn't tried and convicted and he was not given a sentence.

He further testified that in 1954 he was arrested, charged and tried in connection with his issuance of an insufficient fund check in Asheville, North Carolina. However, he asserted that while he had been sentenced the matter was dropped when his family "came up with the money."

He also testified that in 1960 he was arrested in Wichita, Kansas, and charged with false advertising, but he added he was not tried, that he posted a bond and did not go back to Wichita.

He further testified that he had been arrested in Santa Ana, California, in 1961 because he failed to appear on a traffic ticket. He was not asked, nor did he disclose, the result of that arrest. (Pltfs. Ex. 6, pp. 49–51.)

Following the hearing in Fort Worth, Kelly and Reed drove to Dallas, a trip of about 30 minutes. Reed, wanting to know all of the details of the matters as to which Kelly testified, questioned him. Kelly told Reed that in 1953 or 1954, when he was nineteen years old, he owned an automobile which was involved in an accident. Kelly made a claim for insurance and the adjuster approved the claim. Kelly then had the automobile fixed but, after receiving it from the repair shop, he discovered the repairs were not complete. The claims adjuster approved the additional work and when this work was completed, Kelly paid for it by check on the assumption that he was going to receive insurance money. However, at this time the adjuster who had approved the claim was in the hospital. The successor adjuster denied Kelly's claim and as a result the check bounced. Because of that Kelly was arrested but, as he related to Reed, his family "came up with the money, and the matter was dropped." Tr. 62.

During the same ride to Dallas, Kelly told Reed that in 1959 he moved from Phoenix to Los Angeles. In leaving Phoenix he believed that he had a couple of milk bills which had been paid. He closed his Phoenix bank account and opened an account in California. Subsequently the two checks he had written for the milk bills were presented to the Phoenix drawee bank and dishonored for lack of funds. When the milk company made this fact known to Kelly he attempted to pay the milk bill. When he failed to find or missed connections with the milk distributor, he failed to pay the bill. But on a trip to Phoenix he made telephone contact with the milk distributor after which he went to the distributor's office to pay the bill. When he arrived he was arrested. He thereafter retained a lawyer who advised him to plead guilty to the charge of writing insufficient fund checks. He did plead guilty when the lawyer told him that it was not worthwhile to defend the action.

During the same trip to Dallas, Kelly told Reed that he had been charged with drunken driving or being drunk in a public place in California and that the charge was dismissed, that he was not convicted. Kelly also told Reed that he had received a traffic ticket in Santa Ana, California, that he had given a check to his secretary to pay that ticket and that she neglected to do so. He had been arrested on a warrant and that he had paid the ticket.

On the same trip, Kelly told Reed that at one time he had been with a company that retailed cosmetics, hair and scalp treatment and that it had placed an advertisement in Wichita newspapers. He further recounted that on a trip to Wichita for the company he was arrested and charged with false advertising, that he retained a lawyer who told him that arrangements had been made with the prosecutor and that the charges would be dismissed. He left Wichita and heard nothing further about the matter.

Kelly also told Reed that on an occasion Kelly and his wife had in their home, in addition to their own five children, a foster girl child. She stole his car and when apprehended she told the authorities that Kel-

ly had raped her. Kelly was questioned about the matter but was not charged.

When Reed became a partner in defendant firm in 1971, he, of course, brought with him the foregoing information. He acquired this information in a client-lawyer relationship. These were confidences that Reed was not to reveal. Canon 37, Canons of Professional Ethics, Ethical Canon 4, Code of Professional Responsibility. Those partners and associates of the defendant firm who were to be working with Reed in the proxy contest, of course, had a right to be informed by Reed of those confidences. But they then became equally bound to preserve the confidences of Kelly.

Some time after August 4, 1971, when Kelly and Reed first met Cohen and before August 26, Reed advised Kelly to call Cohen and disclose his criminal background. While Reed was not a participant in that conversation, subsequently he talked to Cohen over the telephone at which time he asked Cohen if he had had a conversation with Kelly and when Cohen stated that he had, Reed then inquired of Cohen if he were satisfied and Cohen replied that he was. To Reed Cohen appeared to be aware of Kelly's background.

On August 26, 1971, there was a meeting either at Kennedy Airport or LaGuardia Airport. Kelly and Reed were on their way to Montreal, Canada, and Cohen came to the airport to see them about the Chris-Craft matter. At that time, during the Cohen-Kelly-Reed discussion something was said by Kelly of his criminal background.

On September 23, 1971, a meeting, more particularly referred to above, was held in defendant firm's law offices in Washington. Among other things discussed was the necessity for any dissatisfied stockholder, who wished to participate in a proxy contest, making known anything that was of a derogatory nature in the person's background. Reed made known to all present that it could be expected that in the event of a proxy contest, Chris-Craft management would discover such backgrounds and make them known in fight letters. This was so impressed on those present that at least one stockholder announced that he would not participate and thus have his past life pried into. This requirement was sufficiently serious to Kelly that he vacillated about his participation. It was not until October 18 that he finally decided to become a member of the Independent Stockholders Committee.

Reed on October 10, 1971 addressed a memorandum to Mark Wolf of defendant's firm. (Def. Ex. 21.) In that memorandum Reed recounted how Cohen and Kelly were "both extremely concerned about Kelly's criminal background." Reed further stated that Kelly "in his conversation tonight with Cohen, seems to feel now he should withdraw." Reed informed Wolf that "At this late hour, I too have developed serious reservations." Wolf was requested to confer with senior partner Surrey and resolve whether Kelly's name should be used in the proxy contest "at this time—at any time." Reed expressed the view that Kelly's background was not going to remain secret and that "I think our actions should be governed by the assumption that it will become public."

The Committee's organization meeting was held on October 16, 1971, as recounted above. On that day as well as the day before, Reed, Surrey and others of the firm were satisfied that Kelly had to reveal his criminal record to the Committee and let them determine whether Kelly should participate in the proxy fight. Surrey realized that defendant firm members because of the lawyer-client privilege could not reveal the criminal record of Kelly which Reed had learned from Kelly. In no uncertain terms Surrey and Reed told Kelly he had to make a full disclosure. In addition, Surrey advised Kelly that unless he did, the firm would no longer represent Kelly in the proxy contest and the firm would so advise the other Committee members. This, Surrey stated, might raise a question about the firm's representation of anyone in the proxy contest. Kelly was informed that it was quite likely that his record would be discovered by management and used by it in the proxy contest. Kelly was concerned

and was undecided as to whether he should withdraw from the contest. He was advised by Reed and Surrey that that decision was one he alone had to make.

Toward the end of the rather long October 16 organization meeting, Reed stated that Kelly had a statement to make. Kelly then explained at length the matter of his arrest in Phoenix, Arizona in 1959, on a charge of issuing two checks for which there were insufficient funds, of his plea of guilty on the recommendation of his Phoenix counsel. Kelly offered to withdraw from participation in the proxy contest if the Committee felt that his participation would be detrimental to the contest.

There is a conflict in the testimony as to whether Kelly related anything more than the Phoenix matter. According to the defendant, Kelly began to relate the North Carolina insufficient fund check matter which resulted in his arrest and conviction there in 1953 or 1954. As Jay Westbrook, a defendant partner testified, when Kelly finished his at length description of the Arizona conviction those present were unimpressed with the seriousness of the incident. It was suggested that if that was "all the kinds of things you have to tell us—let's move on." (Tr. 1059–60.) However, according to Westbrook, a member of the firm stated that Kelly had more to say and that he had to say it. Kelly then started to relate the North Carolina incident when he was cut off with the comment that Kelly was only a youth and problems of that type gave no reason for concern.

Surrey was also present at the meeting and he testified that after Kelly finished relating the Phoenix incident he commenced describing the North Carolina matter. He was interrupted by plaintiff Schnell, as Surrey recalls, who asked whether the North Carolina incident was similar to the Arizona conviction. Kelly answered that it was of the same nature but that it had happened much earlier. Then Schnell or someone else said "Let's go on" and that ended the discussion of the criminal convictions. (Tr. 1086–87.)

And Reed was present at the meeting and indeed introduced the subject to Kelly's wish to make a statement. Reed testified that after Kelly related the Arizona incident he began to describe the North Carolina conviction. According to Reed, either Schnell or Balsbaugh inquired if the North Carolina matter was like the Phoenix case. When Kelly replied that it was, Schnell, Reed believes, was the person who said "Oh, shucks. Let's go on." (Tr. 295–97; 471–75.) Cohen, as well as Schnell and Balsbaugh, was present during this recitation by Kelly.

Balsbaugh testified at the trial that Kelly recited the Arizona incident but said nothing about the North Carolina conviction. Instead his testimony at the trial was that when Kelly finished relating the Arizona incident, someone asked "Is that all," to which there was no answer, which resulted in Balsbaugh concluding "That was, in fact, all." (Tr. 597–601.) However, in his 1973 deposition in this case, Balsbaugh testified that Kelly answered "Yes," when either he or Schnell "incredulously asked, 'Is that all.'" (Tr. 683–84.)

Schnell also testified that Kelly at the October 16 meeting related the Arizona conviction. He was certain Kelly said nothing about any other conviction. He has no recollection of anyone asking, after the Kelly recitation of the Arizona incident, "Is that all." (Tr. 948–49.) As a witness Schnell left the impression of being one with a poor memory.

At trial David Cohen also testified about Kelly's statement at the October 16 meeting. But unlike Balsbaugh's testimony that it was Reed who introduced the subject of Kelly having something to relate, Cohen testified that it was he who brought up the subject of having Kelly make a disclosure. (Tr. 767, 768, 769, 673–74, 597.) Like Balsbaugh and Schnell, Cohen testified that Kelly on October 16 only related the Arizona conviction. While Balsbaugh had different versions in his testimony as to what was said after Kelly completed that recitation and as to whether Kelly made any answer to the question "Is that all," and Schnell

had no recollection of the question being asked, Cohen remembered much. Kelly, according to Cohen, was asked "Richard, is that all you have in your past that involves anything of this type of nature," to which Kelly replied by a positive response, saying "That's all there is to it." (Tr. 769.)

There were other differences in the testimony of Balsbaugh and Cohen. Balsbaugh described the room as being tense while Kelly revealed the Arizona conviction, that Kelly gave the appearance of being embarrassed, and that he felt some sympathy for Kelly. (Tr. 597, 682–83.) But Cohen would not characterize Kelly's performance as a reluctant one, nor was Kelly embarrassed or hesitant during his disclosure. (Tr. 856.) Nor could Balsbaugh and Cohen even agree as to where Kelly was positioned when he made his disclosure at the October 16 meeting. According to Balsbaugh, Kelly stood with one foot on the window sill; he was not sitting. (Tr. 597, 680–81.) To Cohen, Kelly sat at the conference table in the room—just to the right of the people sitting at the head of the table. At least that was Cohen's testimony until immediately following the luncheon recess of the trial on January 14, 1977. It was then he was taken on redirect examination and the first series of questions were with respect to the position of Kelly when he made his disclosure. At that time Cohen raised Kelly from his chair and moved him around the conference room "right by the windows, within seven feet of the windows." (Tr. 856–59; 911–12.)

Under date of October 16, 1971, Cherif Sedky drafted a memorandum to "Files" which dealt with the meeting of that date. The memorandum dealt with many subjects discussed at the meeting, including Kelly's recitation of his Arizona plea of guilty to the check charge. The memorandum is silent as to any other criminal convictions of Kelly. Sedky was an associate of the defendant firm. When Jay Westbrook was on the stand he was asked about the memorandum and its failure to record any reference to any further statement by Kelly. Westbrook is a partner of the firm and was at the October 16 meeting when Kelly spoke.

Westbrook testified that Kelly had started to discuss his North Carolina conviction when he was stopped by someone by saying "Let's move on." Westbrook stated that either Sedky had left the conference room when Kelly started to relate the North Carolina matter, or, more likely, "that because of the poo-pooing attitude around the table and the way it was down-played and the fact it was much shorter, that perhaps he simply didn't note it down as a separate disclosure." (Tr. 1074.) I note that neither side called Sedky as a witness to learn from him whether the North Carolina conviction had been mentioned by Kelly. The record does not indicate that he was not available to either party.

As a fact finder, I must resolve the conflicting testimony and determine which of the versions should be accepted as true. In reaching a conclusion I may consider the demeanor of the witnesses on the stand; the manner of testifying; whether a witness gives the impression of having an accurate memory and recollection; whether a witness had any motive for not telling the truth; whether a witness had any interest in the outcome of the case. I may also consider the reasonableness or unreasonableness, the probability or improbability of the testimony of a witness in determining whether to accept it as true and accurate. *Quock Ting v. United States,* 140 U.S. 417, 420–21, 11 S.Ct. 733, 35 L.Ed. 501 (1891).

I have given such consideration to the testimony and I find that the defendant's version should be accepted as true. The three partners of the firm who testified—Reed, Surrey and Westbrook—testified fully as to what they knew without any evasion. When they did not know, they said so.

In contrast, as I have noted, Schnell evidenced a lack of accurate memory. And Cohen, whether it was because he was a lawyer or for some other reason, sought time after time to evade the question by engaging in a non-responsive discourse. Again and again it was necessary to admonish him to respond to the question. Moreover, it is most unlikely that in a telephone

conversation with Kelly ten days prior to the October 16 meeting Kelly only revealed the Arizona conviction, as Cohen would have one believe. The purpose of that conversation as Cohen himself related was for Kelly to tell Cohen about himself. During that conversation Kelly, according to Cohen, stated that "before we go on the proxy fight, I want to tell you something that happened to me some time ago. And I would like you to know about it, and then you can make a decision as to whether we'll go ahead with the proxy fight." (Tr. 761–62.) For Cohen to have made the decision Kelly asked for, he had to know of both convictions. And Reed's October 10, 1971 memorandum to Wolf confirms that Cohen was fully informed. There Reed recited that Reed had spoken "with David Cohen and Richard Kelly, both of whom are extremely concerned about Kelly's criminal background." (Def's Ex. 21.) But Cohen testified at trial that he didn't feel that the Arizona conviction was of a serious nature or "that it should prevent us from continuing with the proxy fight." (Tr. 763.) What was a matter of extreme concern to Cohen on October 10 became a matter of no consequence on October 16. Cohen's testimony is too improbable for me to credit. And Balsbaugh's testimony as to the location of Kelly when he made the disclosure at the October 16 meeting was contradicted by other evidence—even that of Cohen until he ate lunch and changed his story on the afternoon of January 14, 1977. And how improbable was Balsbaugh's testimony that Kelly related his Arizona conviction while standing with one leg on a window sill. Hardly a position for one as embarrassed as was Kelly, according to Balsbaugh or one who would be eliciting Balsbaugh's sympathy.

And the probabilities of this case point to the truth of the defendant firm's version. Kelly's record became known to Reed as a privileged matter. The firm partners realized this. That privilege prohibited them from disclosing to the plaintiffs Kelly's confidence. Only Kelly could do that. But the firm realized the seriousness of criminal convictions in proxy fights. On October 10,

Reed, the senior partner handling securities matters, was so aware of the problems that in the memorandum of that date he raised the question with other firm members. On October 15 and 16 Reed and Surrey impressed on Kelly his obligation to make a disclosure at the October 16 meeting. They informed him that if he did not they would discontinue representing him and so advise the plaintiffs. It is unbelievable that Surrey and Reed, both present at the October 16 meeting, would permit Kelly to only relate the Arizona conviction and say nothing about the North Carolina conviction and still continue to represent Kelly. I credit their testimony that Kelly did describe the North Carolina conviction until Schnell stated that it amounted to nothing and the meeting went forward on other subjects.

Nor is there any merit to the plaintiffs' claim that the defendant firm did not reveal the Kelly Wichita conviction. The firm did not know of that conviction until the December 4 management fight letter was circulated. They learned of it at the same time and in the same way as the plaintiffs.

The questioning of Kelly when the foster child asserted he raped her was not an arrest let alone a conviction. The driving while drunk or being drunk in public charge was, according to what Kelly told Reed, dismissed. The Santa Ana, California, traffic ticket arrest, which ticket Kelly then paid, can hardly be considered a criminal matter. At least the Securities and Exchange Commission does not consider it so. See Rule 14a–11(C) and Schedule 14B. Section 240.14a–11(C) and section 240.14a–102, Item 2(d), C.F.R.

The facts as I find them make a nullity of plaintiffs' claim that defendant firm breached its contract with plaintiffs or engaged in legal malpractice by not making known to them Kelly's criminal record. The fact is that defendant firm made Kelly disclose his entire criminal record as they knew it. The defendant firm met the high standards of fidelity and trust that the law requires of a lawyer in his relation to his client.

A lawyer's duty, as defined by the Supreme Court in a case arising in the District of Columbia, is stated to be in *Savings Bank v. Ward,* 100 U.S. 195 at 198, 25 L.Ed. 621:

"When a person adopts the legal profession, and assumes to exercise its duties in behalf of another for hire, he must be understood as promising to employ a reasonable degree of care and skill in the performance of such duties; and if injury results to the client from a want of such a degree of reasonable care and skill, the attorney may be held to respond in damages to the extent of the injury sustained. Proof of employment and the want of reasonable care and skill are prerequisites to the maintenance of the action; but it must not be understood that an attorney is liable for every mistake that may occur in practice, or that he may be held responsible to his client for every error of judgment in the conduct of his client's cause. Instead of that, the rule is that if he acts with a proper degree of skill, and with reasonable care and to the best of his knowledge, he will not be held responsible. *Bowman v. Tallman,* 27 How. (N.Y.) Pr. 212, 274."

And there is even less merit to plaintiffs' claim that fraud was worked on them by the firm. The essential elements of fraud are "(1) A false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." *Sankin v. 5410 Connecticut Avenue Corporation,* 281 F.Supp. 524, 545 (D.D.C.1968), aff'd 133 U.S.App.D.C. 361, 410 F.2d 1060 (1969). Plaintiffs have completely failed in proving those elements here let alone by a fair preponderance of the evidence.[2]

2. Plaintiffs assert that this case evidences fraud as in the *Sankin* case. A mere reading of the *Sankin* case is a complete answer.

3. The firm of course was aware of the Arizona and North Carolina checks that resulted in convictions of Kelly. But as has been found those

### 2. Insufficient Funds to Cover Kelly's Checks

Equally without merit is the claim of the plaintiffs that defendant firm breached its contract and was guilty of legal malpractice by not revealing to plaintiffs the failure of Kelly's checks to clear. From the evidence in this case I find that defendant firm was aware of only three checks that "bounced," that is, a $10,000 check, a $15,000 check, and a $25,000 check.[3]

The $10,000 and $15,000 checks were given to defendant firm some time between the September 23 meeting and October 16, 1971.

The $10,000 check was dated October 13 and the $15,000 check was dated October 25.

Balsbaugh testified that when the September 23 meeting ended it was with the understanding that each dissatisfied shareholder present would have a reasonable time to decide whether he wished to participate in the proxy contest. Kelly was uncertain whether he wished to participate because he had been told, as were the other shareholders, that their criminal records were bound to become known in the contest. At that time defendant firm was not aware of Kelly's indecision and his $10,000 check as well as Cohen's October 1 $25,000 check and Balsbaugh's $7500 check were deposited on October 14, the date of the opening of the Committee's bank account.[4]

At the October 16 organization meeting of the Committee Kelly said nothing about his vacillation nor did he state anything about the two checks. He knew he would have to contribute $25,000 to participate and could be called on to contribute an additional $25,000 if necessary to carry on the proxy contest.

On October 18, while Reed was in Los Angeles on other business, he saw Kelly.

check convictions were made known to plaintiffs at the October 16 meeting.

4. Schnell's check in the sum of $3712 was not received until the October 16 Committee organization meeting.

At that time he learned of Kelly's vacillation and how on that very day he decided to participate. Kelly told Reed that because of his vacillation he had not deposited funds to cover the two checks but that he then proposed to give Reed a $25,000 check. Reed declined to accept the check and advised Kelly to send it to the defendant firm's office.

Some time subsequent to October 21 Reed learned that the $10,000 check was returned for lack of sufficient funds which he, of course, knew would happen in light of Kelly's October 18 statement. But he also knew that Kelly was sending in a $25,000 check which would meet Kelly's pledge.

While Reed was out of the city on October 27, Kelly's $15,000 check dated October 25 was deposited. This also as Reed had come to know was returned for lack of sufficient funds on November 4, 1971. It was on November 8 that Kelly made out the $25,000 replacement check and it was deposited to the Committee's account on November 9 by defendant firm. It was on December 2 or 3 that Reed learned that the replacement check was returned for lack of sufficient funds.

As evidence that the defendant firm believed that the $25,000 check was good was the fact that the firm on behalf of the Committee drew on the bank account and treated the $25,000 as a credit. On December 3 that account was overdrawn by some $22,508 due to the fact that the $25,000 check had been returned.

On December 3 Reed met with Kelly in Washington and got a promise from him that Kelly would furnish a $25,000 certified or cashier's check. That check was delivered on December 5 and deposited on December 6. Kelly's pledged contribution was thus met.

But plaintiffs claim that had they known of Kelly's insufficient fund checks they would not have participated in the proxy contest. And they assert that defendant firm, while knowing of those checks, breached their contract with plaintiffs, engaged in legal malpractice and committed a fraud on plaintiffs by not informing them

of the Kelly checks. But their contention is without merit in view of the circumstances here. On October 18 Reed learned that Kelly's $10,000 and $15,000 checks were not covered because until that day Kelly had not decided to participate in the proxy contest. At that time he advised Reed that he was issuing a $25,000 replacement check. The defendant firm had no reason to question it—in fact, they relied on the $25,000 Kelly check in drawing on the Committee's account. When Reed learned on December 2 or 3 that the $25,000 check had been returned, he immediately required Kelly to furnish a certified or cashier's check which was deposited and fulfilled Kelly's pledge. There was no obligation on the firm to advise the plaintiffs of that fact since the certified or cashier's check met Kelly's pledge.

Plaintiffs also assert that defendant firm should have advised them that Kelly had given Polarad Electronics Corporation a check for $38,000 which "bounced." But Reed did not learn of this until a day or two after Chris-Craft management had issued its November 20, 1971 fight letter which stated that the $38,000 check was returned unpaid because of insufficient funds. This same fight letter, of course, was also known to the plaintiffs. Subsequent to November 20, 1971, Reed telephoned Isadore Seidler, a senior executive of the Polarad Corporation, and inquired about the charges in the fight letter. Seidler stated that although Kelly's check had been returned, it had been deposited in violation of an agreement between Kelly and Seidler.

Nor is there any merit in plaintiffs' claim that defendant firm knew that a $50,000 check from Kelly to Kelley's Creek Fuel Company "bounced." Reed never knew that there was a $50,000 check until some time subsequent to December, 1971, and he never knew that Kelly had not deposited sufficient funds to cover the check.

And there is nothing in the record to show that any other member of defendant firm knew of either the $38,000 check or the $50,000 check.

When Reed gave his deposition in this case he testified that prior to the fall of 1971 Kelly on three or four occasions gave checks to the law firm with which he had been or was then associated and that those checks were returned unpaid. At trial Reed stated he was mistaken when he gave that testimony on deposition. He explained that subsequently there were certain interrogatories served by plaintiffs. In answering those interrogatories he went to the accounting department of defendant firm and was advised that Kelly had never given the firm a worthless check. And he was advised to the same effect by the accounting department of his former firm.

When this came out at trial the Court advised plaintiffs' counsel that he could call the representatives of the accounting departments in an effort to impeach Reed. At first it was understood he would do so. But later counsel stated he was not going to pursue the matter further. In light of what transpired and Reed's explanation, I find that there were no insufficient fund checks given to either law firm prior to September, 1971.

### 3. Plaintiffs' Agreements and General Releases

■ Each plaintiff executed a general release by the terms of which he released defendant firm. They did so as members of the Independent Stockholders Committee and individually. At the same time each consented to the withdrawal of defendant firm as counsel for the Committee and each plaintiff individually. The releases released defendant firm, its members, agents and employees "from any and all claims it [they] may have or assert, now or in the future, arising out of any cause whatsoever. This release shall operate as a general release of all claims of any kind." (Def's Exs. 2, 37, 10, 11, 12 and 13.)

Plaintiffs assert that their releases are invalid because they were procured by de-fendant firm through (a) fraud, (b) coercion, and (c) violation of the Code of Professional Responsibility.

(a) There is no basis for the plaintiffs contending that the releases were obtained through fraud. As has been found heretofore, defendant firm did not practice any fraud on plaintiffs either with respect to Kelly's criminal record or his $10,000 check, $15,000 check and the $25,000 replacement check.[5] In short, there has been no showing of fraud by the defendant firm.

(b) Each plaintiff individually asserts he was coerced into the signing of the agreements and releases, as well as the consent because of the circumstances existing at the time of the signing. To recount the background of this matter, it is necessary to refer to the October 16 Committee organization meeting. At that time plaintiffs adopted a number of resolutions. One of those resolutions provided for the retaining of defendant firm to render legal services in connection with the proxy contest to replace the then present management of Chris-Craft Industries, Inc. The resolutions, as well as Reed's October 16 letter to the Committee referred to in the resolution, obligated the Committee to deliver to the firm $25,000 to be applied against time fees of the firm billed at its regular hourly rates. It was further provided that if the firm's fees did not reach $25,000 prior to the termination of their services the difference between such fees and the $25,000 would be returned to the Committee. On the other hand, if the fees exceeded $25,000 the Committee would be billed for the excess on a monthly basis. Moreover, the Committee's resolution provided that it would reimburse the firm for its out-of-pocket expenses. (Pltfs. Ex. 3, 5.)

Plaintiffs on October 16 were not unaware that to wage a proxy contest would be costly. In August 1970 Cohen at a Chicago meeting of dissatisfied shareholders of Chris-Craft stated that the cost would ex-

---

**5.** As has been noted heretofore, plaintiffs failed completely to introduce any evidence that certain corporations Kelly tried to merge with Chris-Craft did not have assets of $35,000,000 to $50,000,000 and did not return $5,000,000 a year as income after taxes, or that he did not own or control them.

ceed $200,000. Schnell was present at that meeting and perhaps Balsbaugh. After Cohen had made known the cost and the lengthy, litigious nature of a proxy contest, the Chicago meeting ended with the shareholders present concluding not to get involved.

In September and October, 1971, it was the thought of the Committee that other dissatisfied shareholders would join in financing the contest cost. Cohen believed money would be contributed by Wisconsin shareholders and Kelly expressed the expectation that institutional shareholders would do the same. The fact of the matter is that no shareholders, other than the Committee members, contributed to the cost, even though Balsbaugh and Cohen actively sought to enlist others.

On November 13, 1971, there was a meeting in Cohen's office in Philadelphia, Cohen, Surrey and Reed, among others, were present. At this time Cohen was advised that the hourly firm charges for legal representation by early December would exceed $100,000 plus cost of expenses incurred. As a result of this meeting, Cohen sent his check for $35,000 to the firm for the Committee bank account.

On December 4, 1971, there was a regular meeting of the Committee and the director nominees selected for the proxy contest. Again the Committee's obligation to the firm was made known. Balsbaugh and Schnell made it known that they could not contribute further. Cohen sought to obtain financial assistance from the others at the meeting without success. He realized he had become in fact the Committee so far as financing the proxy contest was concerned.

Following the December 4 meeting, Cohen issued a check in the sum of $25,000 to the firm and a $25,000 promissory note to Surrey personally. The note was payable ninety days from December 17, 1971, the date thereof. The note has never been paid. At the same time Kelly assigned a $100,000 note payable to him by Scientific Control Corporation to Cohen. Cohen discounted the note by $25,000. Nothing further has been paid the firm.

On December 1 Chris-Craft instituted an action in the United States District Court for the District of Delaware against the Committee and its director candidates. The complaint sought damages and injunctive relief. The firm answered the complaint and filed a counterclaim. Prior to this time, defendant law firm, in furthering the proxy contest, brought three actions in the Delaware state court. In one case Chris-Craft management was enjoined from advancing the annual shareholders meeting from a date in January, 1972 to a date in December, 1971; the advancement, of course, would have worked to the advantage of management in that it would have limited considerably the time the Committee would have had to secure proxies for votes at the annual meeting. The second Delaware state case brought by defendant firm on behalf of the Committee, or in its interest, resulted in management being required to make the list of shareholders available to the Committee for the proxy fight. The third state court action was to require Chris-Craft to open its books and records to the named plaintiffs. All of this involved considerable time and legal ability. With the filing of the new action by Chris-Craft in the Federal Court in Delaware, much more time and effort were going to be required.

Some time shortly prior to December 19, 1971, Surrey, the senior partner of the defendant firm, became aware of what all of this was costing the firm. "It was an amount [of money] that had gotten clearly out of hand." As a result of this awareness, a partnership meeting was held on December 19. The firm selected Nussbaum to carry on discussions with the Committee concerning the latter's substantial debt to the firm. Nussbaum was a partner of the firm who was handling the litigation, assisted by Carl Goodman. Goodman and Reed were assigned to assist Nussbaum. (Tr. 1137–40.)

Nussbaum, Goodman and Reed on December 20 met in their Washington offices with Cohen and Barry Ungar, a member of the Philadelphia law firm of Mann and Un-

gar. Cohen told Nussbaum and the others that Mann and Ungar were going to step in as counsel for the Committee in the Chris-Craft case brought in Federal court against the Committee and others. Nussbaum discussed at some length the large amount owed by the Committee to compensate the firm, even though Cohen himself had on many occasions "promised more funds would be forthcoming." (Tr. 1206.) Certainly as of December 7 or 8, if not before, Cohen had learned that the firm's time charges exceeded $100,000 as of November 30, which did not include $7,000 in disbursements by the firm. This information came to Cohen in a letter from Reed. (Tr. 930–31; 932–37.)

While there is no disagreement as to defendant firm on December 20 making known its demand for payment on its fee in an amount of at least $100,000, there is disagreement concerning all that was discussed let alone agreed to. However, on December 21 in Wilmington, Delaware, Cohen did sign a document which among other things provided that the firm would continue its representation of the Committee and its slate of director nominees through the close of business Friday, December 24, and thereafter if the Committee delivered to the firm a certified check for $100,000; that in the event the check was not delivered the firm would forthwith move to withdraw from all matters relating to the proxy contest, including all pending litigation; that "[D]uring this week the firm will attend the deposition of David Cohen and take the deposition of Herbert Siegel, and make such court appearances as may be necessary during the week in connection with these depositions." (Def. Ex. 8). The same document further provided that Cohen agreed that Mann and Ungar's law firm should go on the answer and counterclaim; that Cohen also agreed that if the firm did not receive the $100,000 check, and settlement negotiations were unsuccessful, he would consent to the firm's withdrawal by the close of

business Friday, December 24, and would use his best efforts to obtain the consents of Balsbaugh and Schnell to such withdrawal. (Def. Ex. 8.)

And the same document provided for discharging the Committee from the payment of legal fees to the firm, if the proxy fight was lost, except for payment of the $50,000 already received and Cohen's $25,000 note. In return the Committee relieved the firm from any obligation to continue to perform services in regard to the proxy contest, except that the firm agreed to provide the services of one attorney for a reasonable period to aid in the transition; and the Committee released the firm from any and all claims whatsoever. If the proxy fight was won, the Committee was to pay the firm for all legal services at the firm's normal hourly rates. (Def. Ex. 8.)

While the document was in type dated December 20, it was signed by Cohen on December 21. At the time he signed he deleted a provision that the Committee was to remain responsible for reimbursing the firm for its out-of-pocket disbursements, which were estimated to be in the neighborhood of $20,000. (Def. Ex. 8).

On December 28, 1971, Cohen signed an agreement and general release as well as a consent to defendant firm's withdrawal as counsel for the Committee, except to the limited extent the firm agreed to aid new counsel Mann and Ungar. The Committee collectively and its members individually agreed to reimburse the firm for out-of-pocket expenses in the amount of $25,000, of which $20,000 was to be paid "on or before June 30, 1971"[6] and the Committee and its members individually generally released the firm from any and all claims they or he "may have or assert, now or in the future, arising out of any causes whatsoever." In turn the firm released the Committee from any fees for legal services beyond those already paid, being $50,000 plus a $25,000 promissory note signed by Cohen. (Def. Ex. 2.)[7] Cohen's consent for

---

6. Admitted by plaintiffs to be a mistake in that the date was meant to be "June 30, 1972."

7. Since the Committee was not successful in the proxy contest, and did not receive a money

the withdrawal of the firm was in a separate document. (Def. Ex. 37.)

Balsbaugh on March 22, 1972, signed an identical agreement and general release as well as a consent for the defendant firm to withdraw. (Def. Exs. 11, 12; Tr. 664.) It was on March 21, 1972 that Schnell, after being advised by his own personal counsel, signed the agreement and general release, as well as the consent to withdraw. (Def. Exs. 12, 13; Tr. 1020–22.)

The effect of the execution of the general releases and consents was to free the plaintiffs collectively and individually of a mounting debt which they legally owed the firm. Balsbaugh and Schnell made it clear at the December 4, 1971 meeting that they were going to contribute nothing further to the cost of the proxy contest. And Cohen realized that he alone was the Committee in financing the contest. What happened was that the great expectations of the plaintiffs in September and October, 1971, were never realized. In the words of Cohen in another context, each wanted to " average" his losses and the releases made that possible.

And it is to be remembered that at no time did the firm arbitrarily refuse to represent the plaintiffs. The firm merely requested that, instead of the unfulfilled promises it had been receiving from plaintiffs, it be furnished concrete evidence that the plaintiffs were not repudiating their debt. The evidence was to be in the form of a certified $100,000 check which would have been applied on the debt which exceeded that amount. If such evidence had been forthcoming, the firm's representation would have continued. These plaintiffs were not indigents. Each was in a substantial economic position. It is unbelievable that Cohen with Chris-Craft stock which originally cost $1,000,000 could not, if necessary, have pledged some of the stock for such a loan. But he preferred to use his funds to "average his losses" and continued to buy more stock at a depreciated price.

And Balsbaugh represented between 28,000 and 29,000 shares of Chris-Craft which in February, 1970, had a value of $260,000 to $270,000 (Tr. 554.) But the record shows no evidence that he was interested in applying any amount to his legally owed debt to the firm; in fact to the contrary he refused to contribute more than his October, 1971 $7500 payment. And Schnell in 1970–71 held close to 13,000 shares of common stock of Chris-Craft as well as 1,000 shares of $1.40 preferred. In addition he owned a recreation center and engaged in the real estate business (Tr. 940–41.) But rather than to see what he could do in furnishing concrete evidence to the firm he rested on his original $3712 payment.

The three plaintiffs were not unsophisticated innocents in the world of business and finance. Cohen has been a member of the Pennsylvania bar for almost 25 years. His first 15 years were spent as a trial lawyer. Since then he has engaged in the practice of corporate reorganization and business as well as being a self-proclaimed businessman. (Tr. 717–18.) Balsbaugh has a bachelor of science degree in mechanical engineering, in addition to which he has taken post graduate studies in mechanical and nuclear engineering at the University of Wisconsin and the University of Michigan. Moreover, he is the Assistant Manager of Power Plant Operations for the Wisconsin Electric Power Company. (Tr. 552.) As has been mentioned, Schnell is the owner of a business and is in the real estate business.

The individual wills of these plaintiffs were not overborne by the firm. Indeed each accomplished what seemed to be his objective to avoid the legal debt owed the firm. The only coercion that could be said to be involved in this case was the effect on Balsbaugh and Schnell which resulted from Cohen entering into the release agreement with the firm on December 28, 1971. That left Balsbaugh and Schnell jointly and severally liable for the debt owed the firm.

settlement in connection with the contest, that part of the agreement providing for certain

contingencies in the event of success or settlement is not relevant here.

Balsbaugh described graphically his state of frenzy on March 22, 1972 when he signed the agreement and release. It was then he learned that both Cohen and Schnell left him alone obligated for the debt to the firm. (Tr. 661, 664.)

And finally plaintiffs would have their releases of the firm declared void on the grounds that such releases violated the Code of Professional Responsibility by which defendant firm is bound. (Ethical Canon 6–6 and Disciplinary Rule 6–102.) Cohen, of course, cannot be asserting that to obtain a release from a client is unethical. He and his partners are and have been over the years taking such releases. (Def. Ex. 38, Tr. 893–96.) Whatever validity there may or may not be to Cohen's views on releases in malpractice cases is no more relevant here than Ethical Canon 6–6 and Disciplinary Rule 6–102, supra, because as has been found there was no malpractice on the part of the firm in this case.

I find the releases given by the plaintiffs to be valid and binding.

*Defendant Firm's Counterclaims*

Defendant firm by its counterclaims seeks to recover over $193,000 as earned fees and $18,289.22 paid by the firm as expenses for plaintiffs. Defendant firm on behalf of Surrey seeks to recover from Cohen his $25,000 note to Surrey.

By holding valid the agreements and general releases entered into between the plaintiffs and the firm, the extent of the counterclaims is undercut. Defendant firm is entitled only to the amounts it contracted for in those agreements and releases. In addition, Surrey is entitled to recover on the note.

Those agreements and releases evidence plaintiffs' liability to the firm and Surrey. A hearing on damages claimed by the firm will be set.

This opinion constitutes the Court's findings of fact and conclusions. Rule 52(a), Fed.Rules of Civil Procedure. An appropriate order is this day being entered.