Howard G. PINDER, Sr., and Howard G. Pinder, Jr., Appellants,

v.

UNITED STATES of America, Appellee.

No. 20271

United States Court of Appeals Fifth Circuit.

April 8, 1964.

M. Terry McNab, A. Broaddus Livingston, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Burton Berkley, Attys., Tax Div., Dept. of Justice, Washington, D. C., William A. Meadows, Jr., U. S. Atty. of counsel, for appellee.

Before TUTTLE, Chief Judge, and PHILLIPS * and JONES, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

This appeal involves a joint assessment made on January 27, 1961, for the 10 per cent excise tax on wagers for the period from August 31, 1957, to October 31, 1958, and the $50 wagering occupational stamp tax for that period against Howard G. Pinder, Sr., and Howard G. Pinder, Jr.[1] The assessment totaled $311,503.82, which included a 50 per cent fraud penalty and statutory interest to the date of the assessment. Each of the Pinders paid $50 for the occupational stamp tax and brought this action for a refund of the amounts so paid by each of them. The United States filed a counterclaim for the balance of the assessment, with interest. The case was tried to a jury. It returned a special verdict in which it found:

1. That both taxpayers were engaged in the business of accepting wagers from August 31, 1957, to October 31, 1958;

2. That the Commissioner correctly computed the amount of wagers accepted by the taxpayers during the period and the amount of tax due thereon; and

3. That both taxpayers were liable for the 50 per cent fraud penalty.

Section 4401 of the Internal Revenue Code of 1954, as amended by § 151(a) of the Excise Tax Technical Changes Act of 1958, 72 Stat. 1275, imposes on wagers an excise tax equal to 10 per cent of the amount thereof and provides that each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax on all wagers placed with him. Section 4411 of the Internal Revenue Code of 1954 imposes a special tax of $50 per year, to be paid by each person who is liable for a tax under § 4401, or who is engaged in receiving wa-

gers for or on behalf of any person so liable.

At the trial Pinder, Sr., admitted he was liable for a tax and for a 50 per cent fraud penalty, but contended that the Commissioner erred in determining the length of time he was engaged in the business of accepting wagers and in computing the amount of his weekly "handle," that is, the amount of wagers accepted weekly by him. Pinder, Jr., denied he was in the business of accepting wagers during the period here involved.

Pinder, Sr., is a professional gambler. He operated a Cuban Lottery from November, 1951, through June, 1953, and by his own admission from July 19, 1958, through October 25, 1958. The Pinders were characterized by this court in Barnhill v. United States, 5 Cir., 279 F.2d 105, 106, c.d. 364 U.S. 824, 81 S.Ct. 60, 5 L.Ed. 2d 53, as "professional gamblers." [2]

A Cuban Lottery, sometimes called a bolita, is a lottery paying on the basis of 70 to 1 to a bettor who picks the last two digits of the winning number of the Cuban National Lottery, which is operated on each Saturday by the Cuban Government.

In operating the Cuban Lottery, persons known as agents, or "writers," solicit bets from the public. They write the number selected and the amount bet on a sheet of paper in a book, giving the bettor one copy from the pad and retaining the other. Thereafter, the writer seals the book up in an envelope or paper bag, writes his code name on the outside thereof, and gives it to a pickup man, who transmits it to the counting house, where the bets are checked for winning numbers, or "hits." The tickets ordinarily are not retained for more than five days, but in cases where there is a winning number on which many people have bet, called a "hot" number, they are retained eight to ten days, because bettors who

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter referred to collectively as the taxpayers or the Pinders and individually as Pinder, Sr., and Pinder, Jr.

2. The statement was predicated on the fact that the Pinders had pleaded guilty to a criminal charge of evading federal taxes imposed on wagers and persons receiving wagers. (26 U.S.C.A. §§ 4401, 4411.)

may have been missed in checking for "hits" may later make a claim for a win. A person is subject to criminal prosecution for possession of bolita tickets, which perhaps is the reason they are speedily destroyed.

Lottery writers from time to time change from one operator to another and writers working for an operator miss some weeks.

On July 19, 1958, Special Agents of the Internal Revenue Service began surveillance of the premises located at 1642 Northwest 19th Street, Miami, Florida. They watched that location on August 2, 1958, and again on August 16, 1958. During the first surveillance an automobile which Pinder, Sr., drove was observed parked in front of that location. Pinder, Sr., was also observed in and about such premises and on several occasions was seen approaching the premises by a circuitous route through the neighborhood. The Agents also saw a Negro woman enter the rear door at that location with a small brown paper sack.

On August 16, 1958, Pinder, Sr., saw and recognized Agent Sparacino, one of the surveilling Agents, and thereupon moved the operation to Bernard Pinder's house at 1321 Northwest 25th Street. Thereupon, the Agents took up surveillance at the Bernard Pinder house and continued it for several weeks. At that location from time to time they observed Pinder, Sr., and Pinder, Jr. They also saw Benjamin Adams there. Adams helped to check bolita slips for wins on Saturdays. The Agents also observed Adelaide Boston, a writer, drive up to the Bernard Pinder house. They also saw numerous cars parked at the Bernard Pinder house. Thereafter, the lottery was moved to a new location at 62nd Street and 27th Avenue. Some of the persons seen at the former location were also observed there. However, the lottery was carried on at that location only one week. It was thereafter moved to 10517 Northwest 32nd Place and was in operation there on November 1, 1958.

On August 11, Agent Hilker, who was the Agent in charge of the surveillance, by special arrangement with the Waste Department of the City of Miami, obtained the garbage removed from the garbage can at 1642 Northwest 19th Street. The garbage was obtained by the Agents immediately after it was removed from the can and was not mixed with any other garbage. The Agents examined the garbage and found therein lottery slips, numerous 5" x 7½" envelopes with code names and numbers of about 50 writers or agents written thereon and notations thereon of the total amount of bets. The envelopes bore the brand "Supreme" of the Knight Brothers Paper Company. They also found adding machine tapes totaling approximately $100,000. Hilker, having duly qualified as an expert on lottery apparatus, testified that the bags, envelopes, and tapes were typical paraphernalia employed in the operation of Cuban Lotteries and that the brown paper sacks were known as hallmarks of the calling and were used by writers and agents to conceal the bolita slips, coin envelopes, and the larger envelopes.

On November 1, 1958, Special Agents of the Internal Revenue Service, armed with a search warrant for the premises at 10517 Northwest 32nd Place, Miami, Florida, the last place to which the lottery operations had been moved, searched the premises at that location. They interrogated Pinder, Sr. He told them that he had been in business for only one month and was the sole operator of the lottery. He refused to estimate the gross amount of the wagers accepted by him or disclose the location of his records. A search of his person produced a large amount of currency, a betting slip, and a collection sheet showing the code names of various writers and the current balance between each writer and the operator. Settlements are made weekly between the operator and the writer.

Pinder, Jr., was interrogated and he refused to furnish any information. A search of his person produced currency, part of a manila envelope on which was written "69 Alapata," with other numbers totaling $837.66, an adding machine

tape, and a collection sheet similar to that taken from Pinder, Sr., with code names and numbers and statement of balances due and owing, but for a different week than the Pinder, Sr., sheet.

On search of the premises, the Agents found and seized four adding machines, one calculator, manila envelopes with pads ordinarily used in the lottery business, used bolita tickets, boxes of envelopes and ledger sheets with entries thereon, a laundry basket which had been used to convey some of the bags into the premises, and manila envelopes containing lottery tickets and currency. The envelopes found in the raid bore the brand "Supreme" of the Knight Brothers Paper Company. The material seized in the raid showed there were about 154 writers, with different code names or numbers. Thirty-five of them were identical with the code names or numbers found in the garbage.

As hereinbefore stated, paper bags, coin envelopes, clasp envelopes—usually 5″ x 7½″—and paper pads are used in conducting a Cuban Lottery.

At all times herein material, Pinder, Sr., owned an apartment house located at 2474 Northwest 58th Street, Miami, Florida, and the Pinder Fish Market, also located in Miami. Pinder, Jr., managed the apartment house.

An employee of Knight Brothers Paper Company, who had custody and control of the records, testified to sales of large numbers of coin envelopes and 5″ x 7½″ clasp envelopes made during the period from November 23, 1956, to August 26, 1958, which were billed to the Pinder Fish Market, the Pinder Apartments, or were call orders picked up by Pinder, Jr. There were four of such pickup orders. The orders, other than call orders, were orders billed to and delivered to the Pinder Fish Market or to the Pinder Apartments.[3] A witness who worked at the Fish Market in 1957 and 1958 and for many years prior thereto testified that such envelopes were never used at the Fish Market. No sales were made by Knight Brothers Paper Company after August 26, 1958.

Two writers and one counting house worker testified at the trial. Adelaide Boston testified that she worked as a writer in the operation of the lottery here involved every week from the spring of 1957 to November, 1958. She identified the word "Boston" on an envelope taken in the raid as her code name. She further testified that she worked as a registered agent for Pinder in 1952. The records of the Internal Revenue Service show that she was one of Pinder, Sr.'s, registered agents from 1951 through 1953.

Albert Johnson testified that he wrote bolita tickets for the lottery here involved and that "LC 27" was the code name and number for himself and another writer.

A letter dated November 1, 1958, addressed to "Pinder" and signed "LC 27, Albert Johnson" was found in an envelope on the premises during the raid. It was introduced in evidence over Pinders' objection. Johnson further testified that he wrote the letter, that the signature thereto was his, and that the statement in the letter that he had been in the employ of the addressee "for ten months" was approximately correct.

Benjamin Adams testified that he was a friend of the Pinders and that on each Saturday for a period of one year immediately preceding the raid, except "once in a while" when he could not get off from his regular job, he worked as a checker for "hits" or winning numbers in the lottery.

Both taxpayers testified at the trial. Pinder, Sr., admitted having run the lottery, but claimed that the period he was in business was from July 19, 1958, through October 25, 1958. It should be noted that the dates correspond with the period of surveillance by the Internal Revenue Agents. Pinder, Sr., testified that he was the sole operator of the lot-

3. Included in such sales was one on August 27, 1957, one on October 3, 1957, two on January 16, 1958, one on August 22, 1958, and one on August 26, 1958.

tery and that Pinder, Jr., his son, was merely an unpaid employee serving as a bookkeeper. Pinder, Sr., also testified that he was in prison in the latter part of 1957 and was released in December of that year. He introduced what purported to be records of his lottery operation from the period of July 19, 1958, through October 25, 1958. These records showed total gross wagers in the amount of $86,-223.75. He explained that the reason he often moved his counting house was fear of apprehension.

Pinder, Jr., denied that he had any proprietary interest in the lottery and denied that he ever picked up any envelopes at the Knight Paper Company. He testified that his work was of a bookkeeping nature and that he worked without pay; that he managed the Pinder Apartments for his father and was his father's partner in that business and that he received his full share of 50 per cent of the profits; and that he had been in business with his father almost all of his life. He testified that he and his uncle, Bernard Pinder, visited Pinder, Sr., at the Springfield Prison in the fall of 1957 and that while there Bernard Pinder purchased an adding machine, which was one of the machines seized in the raid. He further admitted that he was present when Bernard Pinder purchased an adding machine in Miami, which was also seized in the raid.

Both Pinders testified that Bernard Pinder did not operate the lottery at any time.

The taxes here involved were computed by taking the total wagers on the day of the raid, arrived at by adding the total amount of the lottery tickets found on the premises on that day and projecting that amount back for the previous 62 weeks, that is, to August 31, 1957,[4] and assessing the tax at 10 per cent of that amount.

■■ The Pinders destroyed the underlying records, that is, the lottery tickets for all of the Saturdays previous to the day of the raid and refused to estimate their gross receipts or disclose the location of their records, even for the period of one month that Pinder, Sr., admitted the lottery was operating, and disclosed no records, whatever, until July 7, 1960, one year and eight months after the raid, when records purporting to cover the period from July 19, 1958, the date the surveillance commenced, to October 25, 1958, were furnished to the Government. Under those circumstances, the method used for computing and assessing the tax was proper.[5]

The assessment made by the Commissioner was prima facie correct and the burden was on the Pinders to prove it was wrong.[6]

■ The sole evidence offered by the taxpayers to overcome a presumption that the assessment was correct was their own testimony and the records which Pinder, Sr., claimed covered the period from July 19, 1958, to October 25, 1958. The mere denial by a taxpayer is not enough to overcome the presumption. It must be evidence which is adequate to meet the burden.[7]

■ The trier of the facts may disbelieve and reject evidence which is improbable, unreasonable, or questionable.[8]

4. At the trial it was stipulated that the total amount of bolita tickets seized was $29,609.45, approximately $1,000 less than the figures used by the Agent of the Commissioner. The judgment was for an adjusted figure, based on the stipulated amount, of $300,241.97, less certain credits for amounts realized from the sale of seized property.

5. Hodoh v. United States, D.C.N.D.Ohio, 153 F.Supp. 822, 825; Merritt v. C. I. R., 5 Cir., 301 F.2d 484, 486; Mendelson v. C. I. R., 7 Cir., 305 F.2d 519, 521, 522.

6. Kilpatrick v. Commissioner of Internal Revenue, 5 Cir., 227 F.2d 240, 244; Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184.

7. C. I. R. v. Smith, 5 Cir., 285 F.2d 91, 96.

8. Archer v. Commissioner of Internal Revenue, 5 Cir., 227 F.2d 270, 273; Banks v. C. I. R., 8 Cir., 322 F.2d 530, 537.

The testimony of Pinder, Sr., that the lottery here involved began on July 19, 1958, was contradicted by many facts and circumstances. It is significant that the commencing date claimed by him coincides with the beginning of the surveillance of the lottery operation by the Revenue Agents. It is at variance with his statement made at the raid that the lottery had only been in operation one month. It is contradicted by the testimony of Benjamin Adams, Albert Johnson and Adelaide Boston. It is contradicted by the employee of the Knight Brothers Paper Company, with respect to the period when supplies for the lottery were purchased and delivered, either to the Pinder Fish Market, the Pinder Apartments, or picked up personally by Pinder, Jr. The adding machine tapes found in the garbage added up to approximately $100,000. They indicated a greater total amount of wagers on August 11, 1958, than the total shown on the books offered by Pinder, Sr., through October 25, 1958.

The envelopes found in the garbage disclosed code names and numbers of 35 writers not embraced in the records offered by Pinder, Sr., which purported to show the code numbers of the several writers. Such records also failed to reflect the code numbers of either Albert Johnson or Adelaide Boston as writers. Thus, it will be seen that the records offered were inaccurate and incomplete.

The jury were justified in disbelieving and rejecting the testimony of Pinder, Jr., that he worked only as an unpaid bookkeeper, under all the facts and circumstances, and, particularly, his admitted business association and relations with his father over most of his life. That he picked up at the Knight Paper Company on several occasions will call orders of envelopes clearly shown to have been used in the lottery, although denied by him, was established by the testimony of a disinterested witness. His presence when two of the adding machines used in the lottery were purchased; his presence on the Saturday of the raid; the lottery paraphernalia and records found on his person; all go to show that his activities were much greater and his connection with the lottery operation much closer than that of a mere unpaid bookkeeper.

 Johnson testified that he wrote the letter referred to above. It was found in the counting house at the raid in a brown bag with Johnson's code name on it, together with the bolita tickets he transmitted that day. Johnson also confirmed the statement in the letter that he had been working as a writer in the lottery for about 10 months. The letter was addressed to "Mr. Pinder," but in view of the fact that Pinder, Sr., admitted he was conducting the lottery, there could be no doubt, under the circumstances, that it was admissible as to him. There was no motion or request that the letter be limited to Pinder, Sr. Moreover, any ambiguity as to the addressee went to the weight of the evidence. We think there was no reversible error in the admission of the letter.

 Adams, called as a witness by the Government, proved to be hostile and gave surprise testimony adverse to the Government. The court permitted the Government, after it had laid a proper predicate therefor, to impeach Adams by testimony of contradictory statements theretofore made by him. In so doing, we think the court did not abuse its discretion.

 The testimony of Hilker in regard to the adding machine tapes found in the garbage was admitted to impeach the testimony of Pinder, Sr., and the records introduced by him. It was clearly admissible for that purpose. It was not used as a basis for the assessment.

We conclude that the trial was free from error and that the judgment should be and it is affirmed.