T.C. Memo. 2000-303


UNITED STATES TAX COURT


PATRICK C. BADELL AND LILLIAN A. BADELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RONALD L. WILSON AND DONNA M. WILSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14830-98, 14831-98.[1]   Filed September 26, 2000.


<u>Ronald L. Wilson</u>, for petitioners.

<u>Timothy S. Sinnott</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioners' income tax and determined that petitioners are

---

[1]  These cases were consolidated for trial, briefing, and opinion by order of this Court on Aug. 19, 1999.

liable for a penalty as follows:

Patrick C. Badell and Lillian A. Badell

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|-------------|
| 1994 | $10,253 | $2,050.60 |
| 1995 | 66,815 | 13,363.00 |
| 1996 | 87,210 | 17,442.00 |

Ronald L. Wilson and Donna M. Wilson

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|-------------|
| 1994 | $9,550 | $1,910.00 |
| 1995 | 59,181 | 11,836.20 |
| 1996 | 87,650 | 17,530.00 |

Petitioners Patrick Badell (Badell) and Ronald Wilson (Wilson) are the sole shareholders of Badell and Wilson, P.C. (B&W), an S corporation. B&W performed legal services for W.R. Kelso Co., Inc. (Kelso), and Kelso constructed a roof on the Badells' residence in B&W's fiscal year 1995.[2] Kelso reported $49,000 of income on its 1994 return based on the legal services it received in lieu of payment of $49,000 it billed to B&W for the roof construction. Kelso credited its accounts payable to B&W in the same amount. B&W did not try to collect from Kelso for the legal services B&W had performed in B&W's 1995 fiscal year or report as income the roofing services it received. After concessions, the issues for decision are:

1. Whether B&W received barter income of $49,000 from

---

[2] Badell & Wilson's (B&W) fiscal year ended June 30.

Kelso in the form of roofing services Kelso provided to Badell in B&W's 1995 fiscal year.  We hold that it did.

2.    Whether B&W may deduct costs it advanced on behalf of its clients of $24,680 for fiscal year 1995 and $37,799 for fiscal year 1996.  We hold that it may not.

3.    Whether petitioners Patrick Badell and Lillian Badell (the Badells) and petitioners Ronald Wilson and Donna Wilson (the Wilsons) are liable for the accuracy-related penalty for negligence under section 6662(a) for 1994, 1995, and 1996.  We hold that they are.

Section references are to the Internal Revenue Code in effect during the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  References to Badell and Wilson are to Patrick Badell and Ronald Wilson, respectively.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.    Petitioners

The Badells lived in Indianapolis, Indiana, when they filed their petition.  The Wilsons lived in Rushville, Indiana, when they filed their petition.

B.    Badell & Wilson, P.C.

Badell and Wilson are attorneys.  They each own 50 percent of the stock of B&W, an S corporation incorporated on June 3, 1982.  B&W's office is located in Rushville.  Badell was B&W's

president, and Wilson was its secretary-treasurer during the years in issue.  Badell and Wilson were the only attorneys B&W employed during the years in issue.

B&W is engaged in the general practice of law, and is a fiscal year, cash-basis taxpayer.  B&W represents clients in minor criminal matters, divorces, bankruptcies, and personal injury cases.  B&W also prepares income tax, Federal estate tax, and Indiana inheritance tax returns for its clients.  Wilson usually prepares those tax returns.

C.    B&W's Payment of Client Costs

B&W paid various expenses for its clients during the years in issue such as court fees, fees for court reporter services, witness fees, and charges for medical records and inquiries to the Indiana Bureau of Motor Vehicles.  B&W recorded these expenses on its books as "Costs Advanced."  B&W also made cash advances during the years in issue to clients whom they believed were destitute.

B&W required its personal injury clients to agree to reimburse B&W for any costs advanced to them and to pay B&W a percentage of any recovery.  B&W's personal injury clients agreed to reimburse B&W for any costs it paid on their behalf, regardless of the outcome of their case.  B&W expected its clients to reimburse B&W for these advances.  However, B&W's clients did not always do so in the taxable year in which B&W

paid the expense.

B&W deducted expenses for client costs of $24,680 for fiscal year 1995 and $37,799 for fiscal year 1996.

D.   W.R. Kelso Co.

   1.   The Relationship Between Kelso and Badell

William Kelso (Mr. Kelso) is the president and owner of Kelso, an Indianapolis construction company.  Badell has known Mr. Kelso since before 1992.

Kevin Blume (Blume) has been the secretary/treasurer of Kelso since September 1993.  Badell has known Blume since about 1990 when Badell was corporate counsel for another company.  Badell and Blume also know each other socially.

   2.   Legal Services Performed by B&W for Kelso

Badell has performed legal services, involving mostly contracts and collection matters, for Kelso since 1992 or 1993.  B&W billed Kelso monthly for legal services rendered.  B&W billed Kelso $43,998.86 for legal services provided from June 1994 to October 31, 1996.  Kelso made four payments totaling $1,224.50 to B&W for legal services provided from October 25, 1994, to October 14, 1996.

B&W usually sues clients whose payments are in arrears if it believes the bill is collectible.  B&W did not try to collect from Kelso from June 30, 1994, to October 31, 1996.

### 3. Roofing Services Provided by Kelso

In 1994, Badell hired Kelso to construct a slate roof on the Badells' residence. Kelso usually gives estimates to customers before beginning to work on projects. However, it did not give B&W or the Badells an estimate of the cost of constructing the roof on the Badells' residence. Kelso began to construct the roof in 1994.

Kelso billed B&W $49,000 on December 31, 1994, for constructing the roof on the Badell residence. B&W made no payments to Kelso until September 1997. Kelso did not try to collect that amount for an extended period of time because its personnel believed B&W was "working off" B&W's charges for legal services by constructing the roof on the Badell residence. Kelso reported the $49,000 as income on its 1994 return, and on its gross profit report for 1994. Kelso credited its accounts payable to B&W for legal services by $49,000 as of December 31, 1994.

Kelso worked on the Badell residence from 1994 to 1999, for which it billed B&W as follows:

| Date of bill | Amount billed | Work performed |
|---|---|---|
| 12/31/94 | $49,000.00 | First house billing |
| 12/31/95 | 4,668.00 | Second year bill |
| 1/22/97 | 4,222.86 | 1996 annual work |
| 3/9/99 | 1,640.63 | Roof & gutter repairs |
| 3/17/99 | 288.75 | Replace damaged slate; clean gutters |

Kelso performed roofing work on B&W's office building, for which it billed B&W $1,572.18 in 1997 and $765.27 in 1999. Kelso had billed B&W $53,668 as of December 31, 1995, and $62,157.69 as of March 17, 1999, for the work performed on the Badell residence and the B&W roof from 1994 to 1999.

E.    Preparation of B&W's Tax Returns for 1995 and 1996

B&W used a computer program to prepare its Forms 1120S, U.S. Income Tax Return for an S Corporation, for fiscal years 1995 and 1996. Wilson gathered the information for the return and reviewed the return when it was completed. Badell signed B&W's returns as B&W's president.

F.    Audit of B&W's Returns

A revenue agent began examining B&W's returns in July 1996. The revenue agent also examined the returns of B&W's shareholders, Badell and Wilson, and met with them separately in July 1996.

The revenue agent met with Mr. Kelso and Blume on October 21, 1996, to discuss the roofing job on the Badell residence. Mr. Kelso and Blume told the revenue agent that B&W intended to "work off" the cost of the roofing job.

G.  B&W's and Kelso's Payments to Each Other

Kelso paid B&W $30,000 on October 31, 1996, $20,000 on September 11, 1997, $25,000 on August 14, 1998, and $10,000 on December 17, 1998.

Kelso began trying to collect the amount owed from B&W after the audit of B&W (discussed at paragraph F, above) began, and after the revenue agent spoke to Mr. Kelso and Blume in October 1996.  B&W paid Kelso $10,000 on September 10, 1997, and $52,157.69 on August 4, 1998, for the work done on the Badells' residence and on B&W's office building.

OPINION

A.  Whether B&W Received Barter Income of $49,000 From Kelso in Fiscal Year 1995

1.  The Issue

We must decide whether, as respondent contends, B&W received barter income of $49,000 from Kelso in fiscal year 1995 in the form of roofing services Kelso provided for the Badell residence.

Gross income includes the fair market value of property or services received in exchange for other services.  See sec. 61(a); Baker v. Commissioner, 88 T.C. 1282, 1288 (1987); sec. 1.61-2(d)(1), Income Tax Regs.  The fair market value of goods and services is normally the amount charged by the providers of the goods and services.  See Rooney v. Commissioner, 88 T.C. 523, 527-528 (1987).

2.  Petitioners' Contentions

Petitioners contend that B&W did not receive barter income in fiscal year 1995 because Kelso and B&W paid each other in full after B&W's fiscal year 1995.

Badell testified that he did not tell Mr. Kelso or Blume that he would work off the cost of the roofing services.  Badell testified that B&W did not try to collect the debt Kelso owed it because B&W expected that Kelso would pay B&W eventually.  Badell also testified that he did not know whether the work Kelso did on his roof was a large or small project and that he did not remember seeing roofing equipment or materials at his home because he was not home during the day when the roofers were there.  We disagree.  We decide whether a witness is credible based on objective facts, the reasonableness of the testimony, the consistency of statements made by the witness, and the demeanor of the witness.  See Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Pinder v. United States, 330 F.2d 119, 124-125 (5th Cir. 1964); Concord Consumers Hous. Coop. v. Commissioner, 89 T.C. 105, 124 n.21 (1987).  We may discount testimony which we find to be unworthy of belief, see Tokarski v. Commissioner, 87 T.C. 74, 77 (1986), but we may not arbitrarily disregard testimony that is competent, relevant, and uncontradicted, see Conti v. Commissioner, 39 F.3d 658, 664

(6th Cir. 1994), affg. 99 T.C. 370 (1992) and T.C. Memo. 1992-616.

We found Badell's testimony to be unconvincing and inconsistent with more convincing evidence in the record. First, Badell's testimony was implausible and incredible. He claimed to not know what roofing services Kelso had performed at his residence and at the B&W office, despite the fact that he testified that he did not pay Kelso until the roofing job at his residence was completed to his satisfaction. Badell's testimony that he did not socialize with Blume is contradicted by Blume's testimony that they did occasionally socialize and that they sometimes drove to football games together.

Second, Kelso treated the transaction as a barter. It billed B&W $49,000 for the roof construction on the Badell residence in 1994, credited its accounts payable to B&W by $49,000, and reported $49,000 as income on its 1994 return even though B&W made no cash payment to Kelso that year. Third, although B&W billed Kelso $43,998.86 on October 31, 1996, and Kelso billed B&W $53,668 on December 31, 1995, neither Kelso nor B&W tried to collect those amounts until after the revenue agent began the audit. Fourth, the parties did not pay each other in full until several years after providing the roofing job and legal services. B&W paid Kelso in Kelso's fiscal years 1998 and 1999, and Kelso paid B&W in B&W's fiscal years 1997, 1998, and

1999.  Fifth, B&W and Kelso had a longstanding business relationship, and Badell and Blume were friends.  Sixth, Mr. Kelso and Blume told the revenue agent who conducted the audit of B&W and petitioners individually that B&W intended to "work off" the cost of the roofing job.  Blume said he did not recall making this statement.  We see no reason to doubt the revenue agent's testimony because it was based on the statements of both Mr. Kelso and Blume, Blume did not deny making the statement, and Mr. Kelso did not testify.[3]

Petitioners contend that "work off" means that B&W and Kelso agreed to pay the other in money for their services.  We disagree.  We construe "work off" to mean that B&W intended to trade legal services for Kelso's roofing services.

Petitioners contend that respondent's barter theory would improperly convert B&W from a cash basis of accounting to an accrual basis.  We disagree.  Respondent's barter theory accelerates into B&W's 1995 fiscal year income which B&W reported in its 1997, 1998, and 1999 fiscal years.  All items of gross income, including cash, property, or services, are included in the taxable year of the cash basis taxpayer in which the amount was actually or constructively received.  See sec. 1.446-1(c)(1)(i), Income Tax Regs.  B&W and Kelso entered into a

_____

[3]  The parties agreed that Mr. Kelso was unavailable to testify.

bartering transaction under which Kelso provided roofing services to B&W in B&W's 1995 fiscal year.

### 3. Conclusion

We hold that B&W must include the $49,000 of roofing services in income in its 1995 fiscal year, the year in which Kelso provided the services.

B.  Whether B&W May Deduct Expenses Advanced on Behalf of Clients for Fiscal Years 1995 and 1996

Petitioners contend that B&W may deduct as ordinary and necessary business expenses for fiscal years 1995 and 1996 amounts it advanced on behalf of its clients for filing and recording fees, court costs, and similar expenses in those years. We disagree.

Expenses paid by a taxpayer under an agreement that he or she will be reimbursed for those expenses are loans or advances and are not deductible business expenses.  See Herrick v. Commissioner, 63 T.C. 562, 569 (1975); Canelo v. Commissioner, 53 T.C. 217, 224 (1969) (attorney's reimbursable costs are not deductible), affd. per curiam 447 F.2d 484, 485 (9th Cir. 1971); Hearn v. Commissioner, 36 T.C. 672, 674 (1961), affd. 309 F.2d 431 (9th Cir. 1962); Patchen v. Commissioner, 27 T.C. 592, 600 (1956), affd. in part and revd. on other grounds 258 F.2d 544 (5th Cir. 1958).

Petitioners contend that B&W can deduct the costs advanced for its clients because, according to petitioners, repayment of

the advanced costs was contingent upon the outcome of the underlying litigation (i.e., a gross fee arrangement). See Boccardo v. Commissioner, 56 F.3d 1016, 1018 (9th Cir. 1995), revg. T.C. Memo. 1993-224. We disagree. In Boccardo v. Commissioner, supra, the U.S. Court of Appeals for the Ninth Circuit held that an attorney's payment of costs and charges in connection with his or her client's litigation is deductible if the client is under no obligation to repay the money spent. Unlike the clients in Boccardo, B&W's clients were obligated to reimburse B&W for the costs it paid on their behalf regardless of the outcome of the client's case. Thus, Boccardo does not help petitioners.

Similarly, B&W may not deduct as business expenses advances it made to those clients it believed were destitute. See Hearn v. Commissioner, supra (unreimbursed expenses advanced by attorney to clients were nondeductible loans in year paid, even though attorney believed it "doubtful" he would collect these items).

Petitioners contend that, in the same tax year B&W advanced costs, B&W was reimbursed by its clients in an amount greater than conceded by respondent. We agree in part and disagree in part. In fiscal year 1995, B&W's clients reimbursed B&W $2,311 for costs paid in fiscal year 1995, over and above those conceded by respondent, and B&W may reduce its gross receipts for that

year accordingly.  However, petitioners have not shown that B&W was reimbursed in an amount greater than that conceded by respondent for fiscal year 1996.

Petitioners contend that respondent's disallowance of B&W's deduction of those costs would have the effect of improperly putting B&W on the accrual method of accounting.  We disagree. Although cash-basis taxpayers may deduct business expenses in the taxable year paid, the costs advanced by B&W for its clients were in the nature of reimbursable loans and were not deductible. Respondent's disallowance of those deductions did not put B&W on the accrual method of accounting.

Petitioners claim that they may deduct as business expenses amounts advanced on behalf of clients just as farmers may deduct their expenses for fertilizers, chemicals, and fuel.  We disagree.  Tax rules for farmers do not make B&W's payment of client costs deductible.

Petitioners contend that respondent permitted B&W to deduct as business expenses advances for client costs in prior years, and claim that its identical treatment of client costs during the years in issue must similarly be accepted.  We disagree.  First, petitioners offered no evidence of a prior examination or audit of B&W's tax returns and thus have not shown that respondent allowed B&W to deduct client advances in prior years.  Second, respondent is not precluded from raising an issue even if

respondent did not raise it in a prior year.  See <u>Hawkins v. Commissioner</u>, 713 F.2d 347, 351-352 (8th Cir. 1983), affg. T.C. Memo. 1982-451; <u>Easter v. Commissioner</u>, 338 F.2d 968, 969 (4th Cir. 1964), affg. per curiam T.C. Memo. 1964-58.

Petitioners point out that the amounts B&W deducted as advanced costs were less than 5 percent of its total income for fiscal years 1994 and 1995 and argue that no material distortion of income or expenses would result from deducting those costs. Petitioners' argument misses the mark.  Respondent did not determine that B&W's income was distorted by its deduction of advanced client costs; instead, respondent determined, and we agree, that B&W may not deduct advanced client costs because they were nondeductible loans to its clients.

C.   <u>Whether Petitioners Are Liable for the Accuracy-Related Penalty for Negligence</u>

Petitioners contend that they are not liable for the accuracy-related penalty for negligence for 1994, 1995, and 1996. We disagree.

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment attributable to negligence or disregard of rules or regulations.  See sec. 6662(a) and (b)(1). Negligence includes failure to make a reasonable attempt to comply with internal revenue laws or to exercise ordinary and reasonable care in preparing a tax return.  See sec. 6662(c).  To avoid liability for negligence, the Badells and Wilsons must show

that they acted reasonably and exercised due care in preparing their 1994, 1995, and 1996 tax returns. See sec. 6664(c)(1).

Petitioners concede that B&W should not have deducted as office expenses in fiscal years 1995 and 1996 the cost of buying PTC Bancorp stock, that the Badells should have included in income for 1994, 1995, and 1996 Badell's fringe benefit income from B&W in the form of personal use of corporate-owned automobiles and health and life insurance for which B&W paid the premiums, and that the Wilsons should have included in income Wilson's fringe benefit income from B&W in the form of personal use of corporate-owned automobiles and life insurance for which B&W paid the premiums. They contend that they should not be held liable for negligence because they readily conceded these errors. We disagree. Petitioners provided no evidence as to the reasonableness of their position regarding these items. They did not explain how they decided to treat these items on their returns or claim that they investigated the proper treatment of or had authority for their treatment of these items. The fact that they conceded their errors does not show they were not negligent. See McCullen v. Commissioner, T.C. Memo. 1997-280.

Petitioners argue that B&W's tax treatment of advanced client costs was not negligent because B&W has used the same method of accounting for costs since B&W was formed and respondent had not previously challenged it. Finally,

petitioners contend that, because (according to petitioners) B&W did not receive barter income from Kelso, they are not negligent for their failure to report that income.

In deciding whether Badell and Wilson were negligent, we consider their legal education and their years of legal experience.  See <u>Tippin v. Commissioner</u>, 104 T.C. 518, 534 (1995); <u>Glenn v. Commissioner</u>, T.C. Memo. 1995-399, affd. 103 F.3d 129 (6th Cir. 1996).  Petitioners have not shown that they acted with reasonable cause and in good faith with respect to these issues.  They did not explain how they prepared their individual returns for 1994, 1995, and 1996, or provide any authority for the positions they took on those returns.  We conclude that petitioners are liable for the accuracy-related penalty for negligence for 1994, 1995, and 1996.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.